**UNITED STATES of America**

v.

**Adelino J. VAZQUEZ, Pedro Elespe, Miguel Martins, Maximina Rivera Martins.**

**Adelino Vazquez, Appellant in 13,952, Pedro Elespe, Appellant in 13,955.**

**Nos. 13952 and 13955.**

United States Court of Appeals Third Circuit.

Argued Jan. 8, 1963.

Decided June 26, 1963.

Ralph G. Mesce, Newark, N. J., for appellant in No. 13,952. Robert J. Jerome, Newark, N. J., for appellant in No. 13,955.

John H. Yauch, Jr., Asst. U. S. Atty., Newark, N. J. (David M. Satz, Jr., U. S. Atty., Newark, N. J., on the brief), for appellee.

Before KALODNER, HASTIE and GANEY, Circuit Judges.

GANEY, Circuit Judge.

The appellants, Adelno J. Vazquez and Pedro Elespe, appeal from judgments of convictions on count one of a three-count indictment returned on October 19, 1960. Count one alleges as follows:

> That from on or about March 15, 1959, to and including on or about May 4, 1960, at Newark in the District of New Jersey and at divers other places both within and without the District of New Jersey,
>
> > ADELINO J. VAZQUEZ,
> > PEDRO ELESPE,
> > MIGUEL MARTINS, and
> > MAXIMINA RIVERA MARTINS,
>
> defendants, did knowingly and unlawfully conspire and confederate to-

gether and with each other, and with others to the Grand Jury unknown to commit certain offenses against the United States, to wit, to defraud the United States of and concerning its governmental function in the administration of the Immigration Laws by the Immigration and Naturalization Service of the United States Department of Justice, an agency of the United States.

It was part of the plan and purpose of the conspiracy to defraud the United States of and concerning its governmental function in the administration of the Immigration Laws and of the Immigration and Naturalization Service by corruptly procuring legal residence for Miguel Martins in the United States.

It was further a part of the plan and purpose of the conspiracy that Miguel Martins, an alien and citizen of Portugal who was a temporary resident alien residing in the United States, did go through a legal ceremony with Maximina Rivera with the sole purpose of enabling Miguel Martins to adjust his status to a permanent resident alien by reason of a marriage to a United States citizen and thereby enabling Miguel Martins to remain permanently in the United States.

It was further a part of the plan and purpose of the conspiracy that the said marriage of Miguel Martins and Maximina Rivera would be a marriage in form only entered into by the parties thereto solely for the purpose of representing it as a marriage to the United States Immigration and Naturalization Service of the Department of Justice and that the parties not live together as husband and wife.

It was further a part of the said conspiracy that the defendants, Adelino J. Vazquez, Pedro Elespe, Miguel Martins and Maximina Rivera Martins, would conceal the transactions and acts aforesaid and would do such other further and different acts as they might deem necessary and expedient to prevent the disclosure to the United States Immigration and Naturalization Service of the existence of said conspiracy.

Count two charges Vazquez and Miguel Martins with fraudulently filling out an Application for Status as Permanent Resident by inserting the false address of Maximina Rivera Martins. Count three asserts that Vazquez and Maximina did knowingly make and cause to be made a fraudulent Petition by a United States Citizen for Issuance of Immigrant Visa by inserting therein a false residence of Maximina. Both counts two and three are alleged to be in violation of § 1001, Title 18 U.S.C., concerning false statements and representations in a matter within the jurisdiction of the United States.

Maximina, without benefit of counsel, and Miguel plead guilty to count one, and not guilty to counts two and three respectively.

On April 12, 1961, Elespe filed a motion for a bill of particulars to have the Government "State the substantive offense, giving the citation of the pertinent statute, code or regulation which the defendant conspired to violate." This motion was denied on May 9, 1961, and the trial of the cause began on October 16, 1961. Vazquez was the only defendant tried on counts two and three. At the end of the Government's case-in-chief, the trial court allowed the motion of Vazquez for judgment of acquittal as to count three, but reserved judgment on similar motions as to counts one and two. On October 19, 1961, at the close of the case, the trial court denied all of the defendants' motions for judgment of acquittal as to count one, as well as Vazquez's motion as to count two. The jury found both defendants guilty on count one, and Vazquez not guilty on count two. On January 1, 1962, at the request of the Government, count two was dismissed as to Miguel and count three as to Maximina.

On January 19, 1962, the court imposed a sentence, under count one, of 3 years on Vazquez, 2 years on Elespe and 3 months (later reduced to 30 days) on Miguel. The imposition of sentence as to Maximina was suspended and she was placed on probation for 2 years for her involvement in the alleged conspiracy.

After filing timely appeals, both defendants, Vazquez and Elespe, by leave granted by this Court on March 6, 1962, moved the trial court for a new trial on the grounds of newly discovered evidence. After a hearing on April 9, 1962, the trial court felt that the new evidence was insufficient for the granting of a new trial.

Defendants, Vazquez and Elespe, contend first that count one of the indictment did not properly allege a violation of an offense against the United States because (1) that count was drawn under the first clause of the general conspiracy statute of the Criminal Code, (2) there is no substantive offense to defraud the United States of a governmental function, and (3) the indictment does not cite the particular substantive offense which they are charged with having conspired to commit.

■■■ The general conspiracy section of the Criminal Code, 18 U.S.C.A. § 371,[1] the alleged violation of which was the basis of count one, condemns two types of conspiracies: One, to commit substantive offenses against the United States specified under other statutes. The other to defraud the United States. The latter conspiracy is itself the substantive offense, and a count of an indictment drawn under it need refer

to no other statute than § 371. See Glasser v. United States, 315 U.S. 60, 67, 62 S.Ct. 457, 86 L.Ed. 680 (1942). It is not restricted to acts that cheat the United States in a pecuniary manner or in a manner concerning property. It is broad enough to encompass the interfering with, obstructing or the depriving it of one of its lawful administrative functions by deceptive means or means that are at least dishonest. Hass v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569 (1910); Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924); Glasser v. United States, supra, 315 U.S. p. 66, 62 S.Ct. p. 463; Bridges v. United States, 346 U.S. 209, 221, n. 19, 73 S.Ct. 1055, 97 L.Ed. 1557 (1953). Except under unusual circumstances, see Bridges v. United States, supra, 346 U.S. pp. 215–224, 73 S.Ct. pp. 1059–1063, fraud is an essential ingredient of the offense.

■■■ We agree with the defendants that, independent of the second type of conspiracy under § 371, there is no substantive offense of defrauding the United States of one or more of its governmental functions in the manner asserted in count one. Hence the Government argues, as it must, that count one informs the defendants that the charge is made solely under the second clause of § 371 which condemns a conspiracy to defraud the United States in any manner or for any purpose. Such an interpretation of count one makes unnecessary the words "to commit certain offenses against the United States, to wit,". The defendants did not move to have the above quoted words stricken as surplusage [2] and

1. Section 371 of the Criminal Code provides, in part:
    "§ 371. *Conspiracy to commit offense or to defraud United States*
    "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. Rule 7(d) of the Federal Rules of Criminal Procedure provides: "(d) The court on motion of the defendant may strike surplusage from the indictment or information."
    In Bridges v. United States, 346 U.S. 209, 223, 73 S.Ct. 1055, 1063, 97 L.Ed. 1557 (1953), the Supreme Court said: "The insertion of surplus words in an indictment does not change the nature of the offense charged."

we consider them as such. With the ignoring of these words, the indictment properly alleges a crime under § 371.

In view of the conclusions here reached, it is important to show that the record discloses the following facts: Miguel Martins entered the United States from Portugal under the status of a nonimmigrant student and with this status he was admitted for a period expiring on June 1, 1959. Upon his arrival here, he lived with his uncle, Alfredo Martins, at 134 Walnut Street, in the City of Newark, New Jersey. Soon after his arrival from Portugal he went to the Central Travel Agency conducted by the defendant, Adelino J. Vazquez, to get a refund on the ticket which his uncle purchased for him to come from Portugal, as it was a return ticket. He secured the refund from the defendant, Vazquez, and later on July 5, 1958, went to see Vazquez about going to school in New York. On the next occasion, he went to see Vazquez in order to make some arrangement so that he could get married to a citizen and stay in this country and asked Vazquez to find him a girl. At first Vazquez refused, but later he agreed for $1500 to find a girl so that Miguel could get married and stay, legally, in this country. Then, according to his testimony, Miguel went to see Vazquez at the Travel Agency to give him $1300, which was the payment finally agreed upon for the securance of a girl to whom he could be married. Miguel also testified that a few days afterwards he went to the Travel Agency to secure a marriage license and there he made the acquaintance of Maximina Rivera, who was to become his wife, for the first time. The defendant, Vazquez, was not there but a lady whom Miguel later knew as Rose DiCatherine was in the office and since Maximina was not there, he went away and came back later about 1:00 p. m. when Rose DiCatherine drove him and Maximina, in Rose's car, to City Hall where they secured a marriage license. The identifying witness on the marriage license was Rose DiCatherine whom Miguel, the

defendant, had never met before. On the way to City Hall there were very few words spoken. After 72 hours had elapsed, which was the time required by the laws of New Jersey, during which time Maximina had a blood test, the defendant, Miguel, again met her at Vazquez's Travel Agency where the defendant, Pedro Elespe, was present and one other witness by the name of Jesus, and they went from there to the residence of Magistrate Castellano where they were married on May 15, 1959. After that both went their separate ways until several days later when Miguel saw Maximina at an apartment for which he was paying the rent in order to get her to come to the Immigration Office and apply for a visa. He testified that he never cohabited with his wife and that he was told before they were married not to live with her at all by the defendant, Elespe.

The Application for Status as Permanent Resident signed by the defendant, Miguel, as well as the Petition for the Issuance of a Visa by Maximina, his wife, which is requisite for the Application for Status as Permanent Resident, were filled out in the Central Travel Agency. The defendant, Miguel, testified he did not give the information necessary to fill out the application for a visa by his wife to the defendant, Vazquez, because he said he did not know where his wife had lived, whether she had been previously married and had none of the other information needed to answer the questions contained therein.

There can be no question, from the record, that the defendant, Miguel, knew he was only going through a marriage ceremony in form only and that the sole purpose of the marriage was that he could secure permanent status in this country, for he never cohabited with her or ever intended to live with her.

Maximina, in testifying for the Government, said that it was Elespe whom she had met at the bar of his Five Hundred Club in Newark who first pro-

posed a marriage to her. This testimony was to the effect that he told her that there was a nice Portuguese fellow who wanted to be married and that it would be a good opportunity for her to go and meet him as she "might be lucky" and he would make a good husband for her and provide a good home for her and her two children, she being unwed. That, pursuant to this conversation with Elespe, she went to Vazquez's office to meet Miguel and to marry him. That when she got there she met Miguel for the first time and went with him to secure a marriage license. Her testimony follows rather closely the testimony of Miguel that immediately after the securing of the marriage license, she took a blood test, met him two days later and went to Magistrate Castellano's office where they were married. They then separated and did not see one another for some time.

On the other hand, Vazquez testified that he met Maximina at Elespe's Five Hundred Club, sat down with her and talked about 10 minutes concerning her marriage to Miguel. He told her to come to his place and there he would introduce them. A day or two later she came to his Travel Agency and met Miguel and they talked about 10-15 minutes together in a back room. He further stated that he prepared all the papers for the marriage ceremony at City Hall, as well as the Application for Status as Permanent Resident and the Petition for the Issuance of Immigrant Visa. Both Maximina and Miguel came to his office for their preparation. Defendant, Miguel, contacted Maximina in order to secure a certificate of permanent status.

However, nowhere in the record from any of the witnesses for the Government or the defense is it shown that Maximina knew the marriage was to be in form only, as she received no money from any of the parties concerned and, as a matter of fact, in testifying for the Government, she said that, like all Puerto Rican girls, she wanted to be married and would have been happy to live with Miguel at the time of their marriage, but that she would not now because she later found the marriage was a false one. In furtherance of this, Elespe arranged with Miguel for him to move Maximina's furniture from New York to the apartment which Miguel had rented for her and it can be gathered from the record that only because of his unwillingness to live with her and, as she later discovered, to use her as a means for his continuing to remain in the country, was the marriage a failure as far as she was concerned. Likewise, none of the other Government witnesses, in any wise, testified that Maximina was aware of the nature of the conspiracy.

■ Accordingly, there was no agreement here between the parties that the marriage was to be in form only, or that they would not live together as husband and wife, as explicitly averred in the indictment, which makes this plan and purpose the core of the conspiracy. Unless there was an agreement between the parties to the marriage that it was to be in form only, there is a variance between the allegata and the probata, which is fatally defective to the indictment. While it is a paradox that Maximina had plead guilty to this indictment, although without benefit of counsel, sometime before the trial of these two defendants, of which this jury was unaware, the Government never pleaded surprise at her testimony nor asked for the right of cross-examination which they were privileged to do, Meeks v. United States, 12 Alaska 545, 179 F.2d 319, 321 (C.A. 9, 1950), but was content to abide her statements and, accordingly, is bound thereby since nowhere in the record is it contradicted.

While it may seem a strange coincidence that she should go and meet the man she was to marry for the first time when they applied for a marriage license and then did not see him again for three days until they were married, yet, considering her status in life, the fact that she was an unwed mother of two children and anxious to become married, we can-

not, absent any evidence of fraud or deceit with respect thereto, from these facts alone weave an agreement between them that the marriage they entered into was to be in form only and especially in view of her flat statement that she was happy to marry him.

Therefore, in view of the lack of agreement between the parties, as averred in the bill of indictment, the essence of the conspiracy drops out, not because the marriage was invalid, as the validity of the marriage is of no importance, Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), but because there was lacking any concert of agreement on the part of the parties entering into the marriage which is the essence of this conspiracy, as pleaded. For while a marriage may be an invalid one, it would be of concern only with the rights of the parties thereto, and if the parties agree that the ceremony should be one in form, the rite or ceremony is only a part of the scheme to defraud the United States of a governmental function. This was plainly pointed out in Lutwak v. United States, supra, but the necessary ingredient obtained in that case, which is lacking here, to wit, that the parties to the marriage were all in agreement that the marriage was to be one in form only and, in fact, they were paid to enter into the marriage and flown to Paris for the performance of the ceremony. In order to comply with the averments in the indictment, the conspiracy to defraud the government of a governmental function, there must be a concert of agreement with respect thereto and there is nothing in this record which shows that Maximina was a party to any such arrangement and since her agreement is an essential requisite of proof, under the indictment as pleaded, the proof thereunder is fatally defective.

Accordingly, the judgment of conviction and sentence in each case will be reversed and the cases will be remanded with directions to enter judgment of acquittal in favor of each defendant.