UNITED STATES of America, Plaintiff–
Appellant (87–5477), Plaintiff–Appellee
(87–5750, 87–5751),

v.

Bob MINARIK and Aline K. Campbell,
Defendants–Appellees (87–5477), Defen-
dants–Appellants (87–5750, 87–5751).

Nos. 87–5477, 87–5750 and 87–5751.

United States Court of Appeals,
Sixth Circuit.

Argued May 6, 1988.

Decided May 18, 1989.

Rehearing Denied in No. 87–5477
Aug. 7, 1989.

Joe B. Brown, U.S. Atty., William T. Warren, III, Nashville, Tenn., Michael L. Paup, Chief, Appellate Section, Tax Div., Dept. of Justice, Roger M. Olsen, William S. Rose, Jr., Robert E. Lindsay, Gail Brodfuehrer (argued), Gary R. Allen, Washington, D.C., for U.S.

Donald Dawson (argued), Asst. Public Defender, Nashville, Tenn., William A. Cohan (argued), Darold W. Killmer, Jennifer A. Greene, Denver, Colo., for defendants-appellees.

Before: MERRITT and NORRIS, Circuit Judges; and HACKETT, District Judge.*

MERRITT, Circuit Judge.

This criminal fraud cause is brought under the second, or "defraud," clause of 18 U.S.C. § 371, rather than the first, or "offense" clause. Section 371 reads as follows:

> If two or more persons conspire *either* to commit any offense against the United States, *or to defraud the United States, or any agency thereof in any manner or for any purpose,* and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. If, however, the *offense,* the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

18 U.S.C. § 371 (emphasis added). The statute's first sentence has always been read in the disjunctive to create a crime of conspiracy to commit an "offense" against the United States that is to be distinguished from the crime of conspiracy to "defraud" the government. The statute is written in the disjunctive in order to crimi-

---

* The Honorable Barbara K. Hackett, Judge of the United States District Court for the Eastern Dis- trict of Michigan, sitting by designation.

nalize two categories of conduct: conspiracies to commit offenses specifically defined elsewhere in the federal criminal code, and conspiracies to defraud the United States. The first category requires reference in the indictment to another criminal statute which defines the object of the conspiracy. The second category, the defraud clause, stands on its own without the need to refer to another statute which defines the crime.

In this case, the Government argues that District Judge Thomas Higgins erred in granting defendants' motion for judgment notwithstanding the verdict. After offering several different fraud theories during the trial, the Government on appeal comes to rest on the theory that the defendants committed fraud by concealing assets from the Internal Revenue Service after receiving notice of assessment for taxes owed.

The primary issue as formulated in the District Court was whether the Government presented evidence sufficient to support a conspiracy verdict that defendants agreed to defraud the government. Although we agree with Judge Higgins' disposition of the case on the facts, we find a more fundamental, overriding reason for this result: the "offense" and "defraud" clauses as applied to the facts of this case are mutually exclusive, and the facts proved constitute only a conspiracy under the offense clause to violate 26 U.S.C. § 7206(4), which provides that any person who:

> [r]emoves, deposits, or conceals, or is concerned in removing, depositing, or concealing, any goods or commodities for or in respect whereof any tax is or shall be imposed, or any property upon which levy is authorized by section 6331 [providing for levy after notice and assessment of a tax], with intent to evade or defeat the assessment or collection of any tax imposed by this title ... shall be guilty of a felony....

26 U.S.C. § 7206(4).

We, therefore, affirm the judgment of the District Court. This resolution of this appeal makes it unnecessary for us to reach defendants' appeal from the District Court's denial of their motion to suppress evidence obtained under a search warrant and for return of property obtained pursuant to the warrant.

I.

The facts and procedural history of the present case are as follows. On February 22, 1985, the IRS issued three tax assessment notices to Aline Merkel Campbell, a resident of Plymouth, Indiana, for the years 1977, 1978 and 1979. All totalled, the IRS demanded payment of $108,788.15 in taxes, penalties and interest. Each notice instructed Campbell to make payment within ten days. Campbell responded that she was "not a person made liable for a tax" and that she did "not owe a tax."

On March 3, 1985, Campbell and a friend, Robert Minarik, travelled to Nashville, Tennessee to discuss with a real estate agent a house owned by Campbell which had been on the market for over a year. Dissatisfied with the agent's efforts to sell the house, Campbell hired a new agent, Robert Dixon. Campbell and Minarik met with Dixon on March 21. On March 22 Minarik wrote Dixon and specified that, if Dixon found a potential buyer for the house, Campbell would accept only cash or cashier's checks in amounts less than $5,000. The selling price was set at $47,500, and Minarik told Dixon not to contact him regarding offers lower than that amount.

Dixon found a buyer who initially offered $43,000 for the house. Campbell rejected this offer. By May 20, the buyer agreed to pay the asking price and met with Minarik and Campbell to close the sale. The buyer gave Campbell seven checks in amounts of $4,900 and one check in the amount of $3,732.18, totalling $38,032.18. The buyer assumed the mortgage for the balance.

The next day Campbell, Minarik and Dixon began cashing the checks. They visited three different branches of First American Bank, which had issued the cashier's checks. At each branch, Campbell cashed two $4,900 checks. At the fourth branch, Campbell gave the teller two $4,900 checks. The teller asked her supervisor to approve the transaction. The supervisor called the bank branch which had issued the checks in

order to verify their authenticity. The supervisor was told to contact the IRS and to stall Campbell until IRS agents arrived.

When the agents arrived, a bank security guard gave them the two $4,900 checks. The agents advised Campbell and Minarik of their constitutional rights. Campbell and Minarik refused to answer any questions and asked if they could leave. The agents said they needed to search defendants' car as soon as a search warrant arrived. Minarik told Campbell to go home with Dixon while he stayed on the scene.

The agents obtained a search warrant from a federal magistrate on the basis of an agent's affidavit. The affidavit said that defendants cashed checks in amounts less than $5,000 each in an effort to frustrate the requirements of 31 U.S.C. § 5322,[1] the provision in the Bank Secrecy Act providing criminal penalties for a bank's failure to report to the IRS transactions over $10,000.

In the meantime, Campbell agreed to loan Dixon $10,000, and Dixon and his wife signed a promissory note in that amount. Dixon deposited $2,000 in his bank and put $8,000 in his safe deposit box. Dixon then drove Campbell to a restaurant. After learning where she was, IRS agents arrived at the restaurant and searched Campbell's purse, finding approximately $20,000 in cash. The next day, Dixon gave the agents the $8,000 he had put in his safe deposit box. On August 2, 1985, the IRS issued to Campbell a Notice of Levy on her assets.

The indictment that followed seemed to abandon the search warrant's theory that defendants had violated the Bank Secrecy Act. In a one-count indictment, defendants were charged with willfully conspiring "to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury." The indictment went on: "It was a part of the said conspiracy that the defendants would conceal and continue to conceal the nature of ALINE MERKEL CAMPBELL'S business affairs regarding a residential property owned by her in Nashville, Tennessee and would conceal and continue to conceal the source and nature of her income from said business affairs." The indictment then recited overt acts allegedly undertaken in pursuance of the charged conspiracy. It concluded, "All in violation of Title 18, United States Code, Section 371."

In a bill of particulars the Government further elaborated its theory of the case. First, it stated that, by conspiring to sell Campbell's real estate for checks totalling less than $5,000 and to cash the checks in amounts less than $10,000, the defendants attempted to avoid the requirements of 31 U.S.C. § 5313(a), the provision of the Bank Secrecy Act that defines the relevant pro-

---

1. Section 5322 reads as follows:

   (a) A person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315) shall be fined not more than $250,000, or imprisonment [sic] not more than five years, or both.

   (b) A person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315), while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12–month period, shall be fined not more than $500,000, imprisoned for not more than 10 years, or both.

   (c) For a violation of section 5318(a)(2) of this title or a regulation prescribed under section 5318(a)(2), a separate violation occurs for each day the violation continues and at each office, branch, or place of business at which a violation occurs or continues.

Section 5322 thus criminalizes conduct prohibited by 31 U.S.C. § 5313, the relevant provision of which reads as follows:

   (a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

hibited conduct.[2] Second, the bill of particulars stated that the reason for "attempting to conceal this transaction" was that Campbell was under notice that she owed $108,788.15 in delinquent taxes, penalties and interest, and that "the defendants were concerned that if notified of the transaction, the Internal Revenue Service would encumber the funds to satisfy the delinquent taxes"—that is to say, that the IRS would impose a levy on Campbell's assets. And third, the bill of particulars stated that, "[i]n attempting to defeat the tax collecting activities" of the IRS, the defendants' actions had "served to impede, impair, obstruct and defeat the lawful functions" of the Department of the Treasury.

The Government's theory of the case evolved throughout the period from the return of the indictment through the trial. The changing theories of the Government's case are significantly dissimilar. As District Judge Higgins noted, these changing theories presented defendants with a moving target as they attempted to prepare their defense.

The indictment charged defendants with willfully conspiring "to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury." This very general statement of the object of the conspiracy is followed only by a description of "a part" of the conspiracy, the "concealment" of Campbell's business affairs and of the source and nature of her income from those affairs. As Judge Higgins observed, nowhere does the indictment indicate that defendants were, individually or together, indebted to the government or were under a duty to disclose or even a duty not to conceal: rather, inasmuch as the violation alleged was that of conspiring to defraud the government, the Government implicitly alleged that the defendants were under a duty not to form an agreement to hinder the Treasury Department in the execution of its lawful functions. Which of the many functions entrusted to the Treasury Department defendants were alleged to have agreed to impede does not appear from the indictment.

The Bill of Particulars appears against this backdrop. It advances two distinct theories of the alleged crime.

*First Theory:* The Bill of Particulars states that the defendants conspired to sell Campbell's house in a way that would avoid the currency reporting requirements of 31 U.S.C. § 5313(a). Then later, during the trial, the Government repeatedly disavowed any argument that the defendants bore a duty to make sure their cash transactions were structured so that they would appear in the bank's reports to the government. Nonetheless the jury was sufficiently confused about the defendants' duties in this respect that it asked for special instructions on the issue, and the District Court then provided an additional jury instruction that defendants were under no duty to trigger the Bank Secrecy Act's reporting requirement.

Though the question is not crucial to this appeal, we note that the District Court quite properly excluded from the jury's consideration any question of individual liability under § 371 for avoiding the requirements of the Bank Secrecy Act. At the time of the acts alleged, financial institutions were under a statutory duty to file reports, but Congress had explicitly left it to the discretion of the Secretary of the Treasury whether a similar duty should be placed on individuals. 31 U.S.C. § 5313(a).[3] Regulations promulgated under that statute did not impose duties on individuals with respect to the filing of reports. 31 C.F.R. § 103.22 (1987). In 1986 Congress made it a crime for a person to evade the reporting requirements of § 5313(a) by causing or attempting to cause a financial institution to fail to file a report, but of course this statute has no retroactive application to the defendants' actions in 1985. 31 U.S.C. § 5324 (West's Suppl.1988). We further note that several circuits have explicitly held that no individual duty existed before the passage of § 5324. *United States v. Murphy*, 809 F.2d 1427 (9th Cir.

---

**2.** Section 5313(a) is quoted in footnote 1, *supra.*

**3.** *See* n. 1, *supra.*

1987); *United States v. Larson,* 796 F.2d 244 (8th Cir.1986); *United States v. Varbel,* 780 F.2d 758 (9th Cir.1986); *United States v. Anzalone,* 766 F.2d 676 (1st Cir. 1985). And finally, we note that cases cited to us holding individuals liable for currency transaction reporting violations in fact hold only that individuals may be liable under 18 U.S.C. §§ 1001 and 2(b) for willfully *causing* financial institutions not to file reports. *United States v. Richeson,* 825 F.2d 17 (4th Cir.1987); *United States v. Heyman,* 794 F.2d 788 (2d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *United States v. Cook,* 745 F.2d 1311 (10th Cir.1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985); *United States v. Tobon–Builes,* 706 F.2d 1092 (11th Cir.1983); *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979). *But see United States v. Cure,* 804 F.2d 625 (11th Cir.1986).

*Second Theory:* The remainder of the Bill of Particulars outlines a theory of the prosecution that could not have been predicted from the indictment. The Government now stated a kind of tax evasion theory for the first time. According to this theory the defendants, having received Campbell's notice of assessment, sought to conceal assets to avoid levy by the IRS. Even as to the exact nature of this allegation, the Government made changes during trial. First it seemed willing to assume the burden of proving that Campbell in fact owed back taxes; but as Judge Higgins pointed out to the Government several times, it failed to adduce any proof on that point. After the District Court clarified this confusion in another additional jury instruction, the Government restated its case as follows: "The important factor is whether or not these defendants believed there were taxes due and owing, and whether, based on that belief, erroneous or not, they set about to thwart the purpose of the Government in collecting the taxes."

The Government also shifted its position as to the legal duty it was alleging the defendants had violated. Conceding that the defendants were under no duty imposed by the Bank Secrecy Act, the Government went on to state that defendants were "required not to conceal their business affairs, which is precisely what the Government has charged them with." Later, however, the Government denied that concealment was central to its theory of the case, and argued that it was required to prove merely a general intent to defraud the United States.

In its Memorandum of Law supporting judgment notwithstanding the verdict, the District Court pointed directly to the confusion which, we have noted, pervades the history of this prosecution. He objected to the circular reasoning by which the Government sought to prove that defendants' acts, taken as a whole, proved dishonesty because they were intended to defraud the government, while seeking to show intent to defraud the government by invoking dishonest objective acts. The solipsism arises from the fact that the Government never defined what duty defendants were under and thus never argued how the objective acts it adduced proved a dishonest intention to breach that duty. We must concur with the District Judge that the Government's failure to specify the crime with which it charged the defendants has generated unacceptable confusion.

## II.

Neither the "ambiguous statutory language" of the defraud clause, nor its "stingy" legislative history, *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 2753, 97 L.Ed.2d 90 (1987), provides guidance as to the scope of this 1867 statute. It has been left to the courts in the interpretation of the statute and the application of it to the facts of particular cases, to define the crime. In the leading case outlining the scope of the defraud clause, the Supreme Court held:

> To conspire to defraud the United States means primarily [1] to cheat the government out of property or money, but it also means [2] to interfere with or obstruct one of its lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest.

*Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924).

Because the reach of the defraud clause is unclear, the *Hammerschmidt* principle should be, and has been, strictly applied: "ambiguity concerning the ambit" of the defraud clause "should be resolved in favor of lenity." *Tanner v. United States*, 107 S.Ct. at 2753. A charge of conspiracy to defraud will not lie where there is no positive obstruction of a governmental program. *United States v. Porter*, 591 F.2d 1048 (5th Cir.1979). As recently as 1987 the Supreme Court was called upon to decide whether an indictment for conspiracy to defraud would lie where defendants were charged with defrauding a private entity that received substantial financial assistance from the federal government. Noting the ambiguity of the statute, the Supreme Court in *Tanner* answered that question in the negative, wryly recalling Justice O'Connor's observation in her dissent in *Dixson v. United States*, 465 U.S. 482, 512, 104 S.Ct. 1172, 1188, 79 L.Ed.2d 458 (1984): "A criminal statute, after if not before it is judicially construed, should have a discernible meaning." *Tanner*, 107 S.Ct. at 2753.

In *Tanner*, as well as in other recent Supreme Court opinions, *see, e.g., McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) (a criminal fraud statute should not be construed "in a manner that leaves its outer boundaries ambiguous"), the Court warned against loose interpretations of criminal fraud statutes which allow the fact situation to define the crime. The problem is particularly acute under the "defraud" clause of § 371 because *Hammerschmidt* stripped the word "defraud" of its common law roots limiting it to purposeful misrepresentation and broadened it to include "interference" with "lawful government functions ... at least by means that are dishonest."

The issue here is complicated by the failure of the Government to charge a conspiracy to commit the statutory offense directly relevant to the alleged conduct—a conspiracy to violate § 7206(4) of the Internal Revenue Code, quoted in the introduction. The Government neither charged a conspiracy offense based on this statute, nor argued before Judge Higgins or before us that this statute establishes a duty of disclosure the violation of which gives rise to criminal liability under the defraud clause of § 371. The Government has either overlooked or chosen to ignore this criminal statute prohibiting concealment of assets from the IRS.

Both the Supreme Court and the courts of appeals have recognized, as Justice Stevens has observed, that Nineteenth–Century statutes criminalizing fraud

> were written in broad general language on the understanding that the courts would have wide latitude in construing them to achieve the remedial purposes that Congress had identified. The wide open spaces in statutes such as these are most appropriately interpreted as implicit delegations of authority to the courts to fill in the gaps in the common law tradition of case by case adjudication.

*McNally*, 107 S.Ct. at 2888. Likewise, the Seventh Circuit has said that the "meaning of fraud" cannot be considered as "frozen by the conception of fraud held by the framers of the statute when it was first passed back in the nineteenth century." *United States v. Holzer*, 816 F.2d 304, 310 (7th Cir.), *vacated on other grounds*, —— U.S. ——, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987).

When courts rely on their inherent common-law powers to interpret criminal statutes, considerations peculiar to the criminal context must be acknowledged. Because our federal government possesses only the limited powers given to it in the constitution, and because lower federal courts possess no powers beside those expressly granted to them by Congress, it has long been recognized that federal trial courts lack the power to create common law crimes. "The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the court that shall have jurisdiction of the offence." *United States v. Hudson*, 11 U.S. (7

Cranch) 32, 33–34, 3 L.Ed. 259 (1812). *See United States v. Coolidge,* 14 U.S. (1 Wheat.) 415, 4 L.Ed. 124 (1816). Thus, "[i]t is well settled that there are no common law offences against the United States." *United States v. Eaton,* 144 U.S. 677, 687, 12 S.Ct. 764, 767, 36 L.Ed. 591 (1892). Of course, federal courts may look to—and thus develop—a federal common law in *interpreting* a statute that creates a federal offense. Clark & Marshall, A Treatise on the Law of Crimes, § 1.04, at 25 (Wingersky ed.) (6th ed. 1958). But in exercising that power we do well to remember that the most fundamental elements of our constitutional scheme commit us to defer to legislative authority in this area. *United States v. Turley,* 352 U.S. 407, 413, 77 S.Ct. 397, 400, 1 L.Ed.2d 430 (1957). It is our duty, moreover, to exercise that deference by refraining from creating, out of common-law materials, new crimes not expressly authorized by Congress. *Jerome v. United States,* 318 U.S. 101, 105–08 and 108 n. 6, 63 S.Ct. 483, 486–88 and 487 n. 6, 87 L.Ed. 640 (1943).

These principles have been applied to limit the expansion of § 371 by judicial interpretation. As the Supreme Court noted in *United States v. Gradwell,* 243 U.S. 476, 37 S.Ct. 407, 61 L.Ed. 857 (1917), because there are no common-law offenses against the United States, "before a man can be punished as a criminal under the federal law his case must be 'plainly and unmistakably' within the provisions of some statute." Where morally reprehensible behavior nevertheless fails to fall within the provisions of § 371, the *Gradwell* Court reminds us, "Congress has always under its control the means of defeating frauds" against the United States. *Id.* at 485, 37 S.Ct. at 410. And of course the Supreme Court has warned that other "important considerations of policy" will require it to "view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Grunewald v. United States,* 353 U.S. 391, 404, 77 S.Ct. 963, 973, 1 L.Ed.2d 931 (1957). Adopting in *Grunewald, Id.* at 404, 77 S.Ct. at 973, Justice Jackson's concurring opinion in *Krulewitch v. United States,*

336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790 (1949), the Court embraced his argument that "[t]he modern crime of conspiracy is so vague that it almost defies definition"—that the charge of conspiracy was so "elastic, sprawling and pervasive" that, if not given judicially defined limits, it would "constitute[ ] a serious threat to fairness in our administration of justice." *Krulewitch,* 336 U.S. at 445–46, 69 S.Ct. at 719–20 (Jackson, J. concurring). Justice Jackson concluded with a reminder that judges should avoid expanding the reach of conspiracy statutes in ways that trench on the legislature's prerogative in this area:

> True, the modern law of conspiracy was largely evolved by judges. But it is well and wisely settled that there can be no judge-made offenses against the United States and that every federal prosecution must be sustained by statutory authority.

*Krulewitch,* 336 U.S. at 456–57, 69 S.Ct. at 724–25 (Jackson, J., concurring).

Thus, we must proceed with special care in interpreting § 371. As the Supreme Court has held:

> [I]ndictments under the broad language of the general conspiracy statute must be scrutinized carefully as to each of the charged defendants because of the possibility, inherent in a criminal conspiracy charge, that its wide net may ensnare the innocent as well as the culpable.

*Dennis v. United States,* 384 U.S. 855, 860, 86 S.Ct. 1840, 1843, 16 L.Ed.2d 973 (1966). As the Third Circuit, following *Dennis,* has stated, courts "must be mindful that the statute is a broad one, and that there is a danger that prosecutors may use it arbitrarily to punish activity not properly within the ambit of the federal criminal sanction." *United States v. Shoup,* 608 F.2d 950, 955–56 (3d Cir.1979). *See United States v. Rosenblatt,* 554 F.2d 36, 41 n. 6 (2d Cir.1977) ("potential for abuse" under defraud clause much greater than under offense clause because under the former the charge is "broader and less precise"; expands scope of conspiracy and thus both liability for crimes of coconspirators and admissibility of co-conspirators' declara-

tions; includes more overt acts and thus both lengthens period of statute of limitations and increases number of jurisdictions where venue can be laid; and may avoid the limit placed on penalty for conspiracy to commit a misdemeanor).

All of these concerns are embodied in the canon of statutory construction known as the rule of lenity. As Chief Justice Marshall stated:

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle, that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment.

*United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). The rule tells us that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Williams v. United States*, 458 U.S. 279, 290, 102 S.Ct. 3088, 3094, 73 L.Ed.2d 767 (1982); *see also Dowling v. United States*, 473 U.S. 207, 214, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985).

In the present case, we are confronted with a statute which Congress has left ambiguous since it was first adopted in 1867. Courts may not avoid the responsibility of giving the defraud clause some meaning, by the process of common-law interpretation described by Justice Stevens in *McNally*. But when, as in the *Hammerschmidt* case, the judicial branch sets a definition of "defraud" that itself is subject to continual expansion, it retains the countervailing responsibility to keep that definition from engulfing the statute itself and obliterating the carefully drawn relationship between its two clauses. Thus, the scope of the "defraud" clause may expand as new kinds of fraud and new governmental programs are invented, or it may contract when Congress deals specifically with a given problem, creating a specific offense out of conduct previously criminalized only where it took the shape of a conspiracy to defraud the United States. The court should require that any conspiracy prosecution charging that conduct be brought under the offense clause in order "to achieve the remedial purposes that Congress had identified," *McNally*, 107 S.Ct. at 2888, if it is clear that Congress has specifically considered a given pattern of wrongful conduct and enacted a specific statute with a specific range of penalties to cover it.

Professor Goldstein has pointed out in his seminal article on the "defraud" clause, A. Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405 (1959), that such a pattern of common law interpretation must be followed if the courts are to remain true to the theory they have developed for reconciling the "offense" clause and the "defraud" clause of § 371. The courts have consistently held that the two conspiracy clauses of § 371, taken together, create one offense, not two. *Braverman v. United States*, 317 U.S. 49, 52–53, 63 S.Ct. 99, 101–02, 87 L.Ed. 23 (1942); *May v. United States*, 175 F.2d 994, 1002 (D.C.Cir.), *cert. denied sub nom. Garsson v. United States*, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949); *United States v. Manton*, 107 F.2d 834, 838 (2d Cir.1939), *cert. denied*, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). Thus, cases arising under § 371 have avoided creating multiple offenses under the two clauses. And yet, as we have said, courts have equally consistently held that the offense and defraud clauses are disjunctive. *Cure*, 804 F.2d at 628; *United States v. Vazquez*, 319 F.2d 381, 384 (3rd Cir.1963); *United States v. Pezzati*, 160 F.Supp. 787, 789 (D.Colo.1958); *United States v. Klein*, 124 F.Supp. 476, 480 (S.D.N.Y.1954), *aff'd on other grounds*, 247 F.2d 908 (2d Cir.1957). Cases arising under § 371 have avoided creating multiple offenses under the two clauses. These precedents, taken together, show that § 371 creates *one* crime that may be committed in *one of two* alternate ways. Such a conclusion is entirely consistent with the rule requiring courts to give penal statutes a narrow interpretation. Thus an

individual whose alleged wrongful agreement is covered by the offense clause (because covered by a specific offense defined by Congress), as well as arguably by the broad defraud clause, cannot be convicted or punished for both. Only by treating conspiracies to commit specific offenses (which are also arguably general frauds) exclusively under the offense clause of § 371 can multiple convictions and unnecessary confusion be avoided.

Such a common-law interpretation of § 371 is consistent with what appears to be the primary purpose of the language in the 1867 statute criminalizing conspiracy to defraud the government. Its purpose was to reach conduct not covered elsewhere in the criminal code, a code which, unlike the present criminal code, had not elaborated specific fraud offenses. In light of later legislation creating numerous specific fraud statutes, the "defraud" portion of the statute should be viewed "as an interim measure protecting the [g]overnment until such time as Congress has been able to deal more specifically with a given problem." Goldstein, 68 Yale L.J. at 450.

Moreover, if conspiracy agreements the object of which fall under a specific offense defined by Congress are allowed to be prosecuted under the "defraud" clause, the purpose of the misdemeanor provision of § 371 will be defeated. That provision says that when the "offense ... which is the object of the conspiracy" is a misdemeanor, the punishment under § 371 must be limited to the punishment provided for the misdemeanor. Congressional intent will be defeated if the government can prosecute under the defraud clause conduct which Congress has isolated and defined as a misdemeanor. The misdemeanor provision, as well as the Government's handling of this case, graphically illustrates the confusion generated if the offense clause and the defraud clause are treated as overlapping rather than as mutually exclusive.

We therefore reject the ruling of *United States v. Sans*, 731 F.2d 1521 (11th Cir. 1984). In that case, the Eleventh Circuit held that, even where Congress had denominated the object of the conspiracy a crime,

and had determined that that crime was a misdemeanor, a court should nevertheless permit a prosecution under the defraud clause. 731 F.2d at 1533–34. In doing so the court nullified two express determinations of Congress: first, its express decision in § 371 to subject conspiracies to commit an offense where the offense is a misdemeanor to a lesser punishment than that applicable to conspiracies to commit a felony or conspiracies to defraud; and second, its decision in passing the misdemeanor statute in question to give that form of wrongdoing a definition and to classify it as a misdemeanor.

Finally, we believe that our interpretation is the only way we can give full effect to the intention of Congress as expressed in § 7206(4) of the Internal Revenue Code. The legislative history of § 7206(4) emphasizes the importance of this concern. In 1954 Congress added the duty not to conceal assets upon which levy is authorized to this section of the tax code, which theretofore had prohibited only the concealment of items on which tax was owed. House Report, No. 1337, U.S.Code & Admin.News, at 4017, 4573 (1954); Senate Report, No. 1622, U.S.Code & Admin.News, at 5252 (1954). Section 7206(4), as amended, therefore reflects a deliberate choice of Congress to criminalize concealment only of the sort and only under the circumstances defined in the language of the statute. As this Circuit has held, the language of the statute clearly indicates that Congress determined, for example, not to criminalize concealment before levy is authorized. *United States v. Swarthout*, 420 F.2d 831, 835 (6th Cir.1970) ("If in amending this sentence Congress had intended to make it an offense to conceal property before levy was authorized (i.e. before assessment), it knew how to do so.").

Judge Higgins repeatedly pointed out to the Government the problem of when the duty to disclose arises under the defraud clause of § 371. The problem illustrates the necessity of treating the offense and defraud clauses as mutually exclusive in this case. Unlike § 7206(4), the defraud clause of § 371 does not spell out whether the duty to disclose assets to the govern-

ment arises when the debtor first suspects that he may be indebted, or when the government begins an investigation or audit, or when the government first asserts its claim, or when it makes a formal assessment, or when the tax court or federal court upholds its claim of indebtedness, or when the government levies on the property in question or records a lien. Section 7206(4) solves that problem. It is clear that a duty of non-concealment arises only at the time of notice of assessment, not at some earlier stage in the collection process.

The fact that § 7206(4), as amended, appeared in our positive law at the time of Minarik's and Campbell's prosecution for conspiracy to conceal sharply differentiates the present case from *United States v. Klein*, 124 F.Supp. 476, 480 (S.D.N.Y.1954), *aff'd*, 247 F.2d 908 (2d Cir.1957), a prosecution for conspiracy to defraud by concealing the nature of business transactions and the nature and source of income brought before § 7206(4) was amended. This section of the Internal Revenue Code creates and defines Campbell's primary duty not to conceal the proceeds of her real estate transaction. Campbell had been notified of the IRS's conclusion that she owed back tax; at the moment she received the notice of assessment, she came under the duty imposed by § 7206(4) not to conceal assets upon which the IRS was empowered to levy. At the same time, she and Minarik incurred a duty imposed by § 371 not to form any agreement with the intent to violate § 7206(4). This layer of liability, arising from the offense clause of § 371, is to be distinguished from the actual charge in this case, which was brought under the conspiracy statute's defraud clause.

But when we compare the defendants' duty under § 7206(4) and under the offense clause of § 371 with that assumed by their indictment under the defraud clause of § 371, we note a divergence. The indictment and the prosecuting attorney's statements in the course of the trial suggested the defendants were obligated not to conceal Campbell's general "business affairs," whereas § 7206(4) expresses a Congressional determination to criminalize the concealment of "property upon which levy is authorized." In addition, the indictment and the instructions under which the jury reached its verdict stated the element of intent only in the most general terms—an intent to defraud the United States by defeating the lawful operations of the Department of the Treasury—while § 7206(4) criminalizes only acts of concealment undertaken "with intent to evade or defeat the ... collection of any tax imposed by" the Internal Revenue Code.

While it is true that the general category "business affairs" may be deemed to include "property upon which levy is authorized," and that the category "intent to defraud the United States by defeating the lawful operations of the Department of the Treasury" includes an intent to evade or defeat the collection of tax by the IRS, the language used in the indictment could refer to many, many other criminal schemes as well. Certainly, if Minarik and Campbell had been indicted for conspiracy to commit the offense against the United States defined by § 7206(4), the confusion that permeated their trial would have been obviated. We find the presence of this confusion especially problematic because Congress, in amending § 7206(4) to include concealment of assets upon which levy is authorized in order to avoid the payment of a legally established tax, has chosen a particular definition of what constitutes criminal concealment after notice of tax assessment. Despite the presence in the Internal Revenue Code of this limiting and clarifying language, this prosecution proceeded without the Government ever having to make clear—to the Grand Jury, to the District Court, to the defendants, or to this Court—what it referred to when it charged defendants with conspiring to defraud the United States by impeding the Department of the Treasury.

Such confusion in a criminal prosecution is not permissible when an indictment for conspiracy to commit the offense defined in § 7206(4) would have provided all the clarity that was missing. At the same time, it is important to emphasize the limits of our holding today. We do nothing to disturb the well-settled principle that modern crimi-

nal statutes defining new offenses do not necessarily erode or displace § 371 conspiracy liability in general. Such statutes create a new offense or object for conspiracy prosecutions. As this Court has held, Congress, in adopting the various provisions of the Internal Revenue Code, contemplated that § 371 should retain its vitality. *United States v. Shermetaro*, 625 F.2d 104 (6th Cir.1980); Mertens, *The Law of Federal Income Taxation* 14, Ch. 55A.10 (1988). And of course numerous cases have recognized that more detailed statutes criminalizing substantive acts, enacted after § 371, do not impliedly repeal or preempt the prohibition on conspiracy to commit those acts contained in § 371. *United States v. Little*, 753 F.2d 1420 (9th Cir.1984); *United States v. Zang*, 703 F.2d 1186 (10th Cir. 1982), *cert. denied*, 464 U.S. 828, 104 S.Ct. 103, 78 L.Ed.2d 107 (1983); *United States v. Tarnopol*, 561 F.2d 466 (3d Cir.1983); *United States v. Bazzell*, 187 F.2d 878 (7th Cir.), *cert. denied sub nom. Lasby v. United States*, 342 U.S. 849, 72 S.Ct. 73, 96 L.Ed. 641 *reh'g denied*, 342 U.S. 889, 72 S.Ct. 171, 96 L.Ed. 667 (1951); *Burton v. United States*, 175 F.2d 960 (5th Cir.1949); *United States v. Pezzati*, 160 F.Supp. 787 (D.Colo.1958). And finally, we recall that § 7206(4), by its provision criminalizing concealment of property upon which levy is authorized, does not oust other statutes criminalizing tax evasion. *United States v. Hook*, 781 F.2d 1166 (6th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986).

But where the duties of a citizen are as technical and difficult to discern as they are when a taxpayer, before levy, engages in otherwise legitimate activities that may make ultimate collection more difficult, we hold that a Congressional statute closely defining those duties takes a conspiracy to avoid them out of the defraud clause and places it in the offense clause. The conspiracy is still an indictable offense under the first clause of § 371. But compliance with our rule today will mean that prosecutors and courts are required to determine and acknowledge exactly what the alleged crime *is*. They may not allow the facts to define the crime through hindsight after the case is over.

In the case before us, the prosecutors, either intentionally or unintentionally, used the defraud clause in a way that created great confusion about the conduct claimed to be illegal. The case should have been brought under the offense clause of § 371, and Judge Higgins was correct in his judgment that the verdict cannot be allowed to stand. Accordingly, the judgment of the District Court is affirmed.