**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Randall S. GOULDING and Michael M.
Ushijima, Defendants–Appellants.**

Nos. 92–3616, 92–3630.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 17, 1994.

Decided May 25, 1994.

Rehearing and Suggestions for Rehearing
En Banc Denied June 20, 1994.

John F. Podliska, Asst. U.S. Atty. (argued), Deborah A. Devaney, Office of U.S. Atty., Criminal Div., Chicago, IL, Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S.

Joshua Sachs (argued), Chicago, IL, for Randall S. Goulding.

Robert G. Mackey, Chicago, IL, Lawrence J. Fleming, St. Louis, MO, for National Ass'n of Criminal Defense Lawyers amicus curiae.

Richard H. Parsons, Peoria, IL, Daniel G. O'Day, Cusack & Fleming, Peoria, IL, for Illinois Attys. for Criminal Justice amicus curiae.

Wayne B. Giampietro (argued), Witwer, Burlage, Poltrock & Giampietro, Chicago, IL, for Michael M. Ushijima.

Before CUMMINGS, KANNE and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Randall S. Goulding and Michael M. Ushijima, both Illinois lawyers, were charged in an 18–count indictment with conspiracy to defraud the United States, mail fraud and illegal transportation of currency and monetary instruments in violation of 18 U.S.C. §§ 371 and 1341 and 31 U.S.C. §§ 5316(a) and 5322(a). A jury found them guilty on all counts. They were each sentenced to six months' incarceration on Count 1 and five years' probation on Counts 2 through 18. Both defendants were ordered to make restitution of $8,000 to the United States and to perform 500 hours of community service.

## I. *Facts*

In late 1984 or early 1985, Goulding told government informant James Evegelatos that he knew how to move money around the world to hide it from the government in order to avoid paying taxes. Goulding

claimed to have bankers in Hong Kong, Switzerland and the Cayman Islands, all of whom were acquainted with his system. Evegelatos reported the conversation to the government in September 1986 and an undercover investigation was commenced.

From December 1986 until August 1987, Internal Revenue Service Special Agent Gregory Myre using the name T.J. Ryder posed as a businessman who had, over the four previous years, acquired $400,000 in illegal income from bookmaking activity in Florida. Ryder was introduced to Goulding by Evegelatos in December 1986.

At their initial meeting Ryder informed Goulding that he wished to have use of his income without reporting it to the Internal Revenue Service. Goulding told Ryder that if Ryder declared his unreported income, the taxes, penalties and interest might eat up the entire unreported amount. Goulding explained, however, that for $10,000 he could arrange for Ryder's money to be moved through a corporate account in the Cayman Islands and brought back to the United States as a non-taxable corporate loan. Goulding drew a flow chart to depict the system. He acknowledged that Ryder would be in a lot of trouble if anyone found out about the system, but reassured Ryder that the system could be set up so that the Internal Revenue Service would not detect it. Goulding claimed his system "cleaned the money."

In February 1987, Ryder met with Goulding again. Ryder again explained that his unreported cash income came from illegal bookmaking activities. In response, Goulding described Cayman Islands' secrecy laws and explained how, given such laws, corporations and trusts could be established that could hide Ryder's transactions. Goulding again used a chart to explain his system, noting that the trusts could be controlled by Ryder through "wish letters" of instruction from Ryder to a trustee in the Cayman Islands. Goulding offered to travel there with Ryder to introduce him to lawyers, bankers and trust officers.

Ryder, however, told Goulding that he would prefer to transact business by mail and telephone. Goulding warned Ryder of international wire taps that might be involved and that international mail might be opened by the Internal Revenue Service and others. Ryder nonetheless insisted that he would not go to the Caymans (IRS policy prohibited agents from travelling outside the United States), but made clear that he was willing to pay Goulding to take his money there. Goulding claimed not to have available couriers, despite his contacts in the Caymans, and indicated that a second person would need to be enlisted in the scheme. He suggested his associate co-defendant Ushijima, who he claimed had worked with him before on such "international tax matters."

Later in February 1987, Ryder met with Goulding at the O'Hare Hilton Hotel in Chicago and was introduced to Ushijima. Ryder told Ushijima that he had cash income that had not been reported on his tax returns. Ushijima described his system of trusts and corporations to be set up in the United States and Cayman Islands to move the money. He said that a management company in the Caymans would provide an existing, dormant "shell" company. The company would be owned by a trust administered by a bank, which would take instructions from Ryder through "wish letters." He added that a domestic corporation would be set up in Minnesota to receive funds from the Cayman corporation and convey Ryder's money back to him as a "loan."

Ushijima indicated that his fee would be $5,000 and that the best way to send the money to the Caymans was in cash by courier rather than international wire transfers or the mails. Ushijima warned Ryder that the courier would not declare the cash taken to the Caymans even though it was illegal to take more than $10,000 out of the United States without declaring it. Ushijima also warned Ryder that the cash could be seized if the courier were caught. The defendants acknowledged that the federal reporting requirement also applied to any negotiable instrument, including bearer bonds.

At this same meeting, Ushijima said the fee for Goulding, himself and courier would be $15,000. Thereupon Ryder gave Goulding a $5,000 cashier's check in part payment and

made arrangements to deliver $30,000 to the defendants to be sent through the Caymans, with $7,000 additional cash to go to the defendants as their fee and for expenses.

In March 1987, Ryder again met with Goulding at the O'Hare Hilton and gave Goulding $37,000 in $100 bills. Goulding recommended that Ryder report the income but added that the taxes, interest and penalties would total close to 100% of Ryder's money.

Ryder's $30,000 was transported by courier to the Caymans about March 7, 1987. No Customs Service report was filed. Ushijima also traveled to the Caymans on March 7 and Goulding followed on March 9. The two arranged for the formation there of a trust, a corporation known as Tarbet Investments, Ltd. C.I., and a corporate bank account in Tarbet's name. Ownership of Tarbet was put in the name of local Cayman nominees. Goulding later formed a domestic corporation (Tarbet Investments, Ltd. U.S.) in Minnesota and opened a corporate bank account there for that corporation.

On May 13, 1987, Trevor Lloyd, a Cayman resident acting on instructions of Ushijima, caused $28,000 of Ryder's money to be wire-transferred from the corporate account of Tarbet C.I. in the Caymans to the Minnesota bank account of Tarbet U.S. Goulding provided Ryder with fictitious documents showing a $15,000 loan from Tarbet U.S. Goulding also provided Ryder with a blank promissory note to be used to create fictitious loan documents for subsequent money transfers pursuant to the scheme.

On May 18, 1987, Ryder met with Ushijima in his law office in Des Plaines, Illinois, to arrange for the transfer of an additional $120,000 to the Caymans. Ushijima said he would deposit the money into his corporate escrow account in Chicago and convert $100,000 of the $120,000 into bearer bonds through his Chicago broker. Ushijima asserted that he was "laundering" the money for Ryder. He told Ryder that the bonds would be taken to the Caymans by the same courier who had transported the initial $30,000 and that once the bonds were in the Caymans, he would open an account in the name of Tarbet C.I. to sell the securities. The balance of Ryder's $120,000 was to be wire-transferred to Ushijima's corporate escrow account in the Caymans. When Ryder expressed concern about possible questioning of Ushijima about where the money came from, Ushijima replied that he would say it came from clients but would not identify them under the attorney-client privilege. Ryder and Ushijima made arrangements for the two of them and Goulding to meet the next day for Ryder to deliver the additional $120,000.

The next day Ryder met with defendants at an Elk Grove, Illinois, motor lodge. Ryder thereupon gave Goulding $120,000 in cash. Goulding counted the cash and then left to meet Ushijima at his law office. $100,000 in bearer bonds were purchased as Ushijima had described and were transported by courier to the Caymans on June 6, 1987, and sold. Although required, no Customs report was filed when the bearer bonds were transported out of the United States. The additional $20,000 was wire-transferred to the Caymans and deposited, along with the proceeds of the sale of the bearer bonds, into the Tarbet C.I. bank account in the Caymans. On June 29, $118,000 was wire-transferred by Trevor Lloyd from the Tarbet C.I. account in the Caymans to the Tarbet U.S. Minnesota account. In all, there were 15 uses of the mails to further the defendants' scheme to defraud the Internal Revenue Service of taxes due.

At trial the defendants sought to show that they acted in good faith to protect the confidentiality of their client. Ushijima testified that Ryder's money had not been transported by courier to the Caymans. Ushijima, his step-daughter and her boyfriend testified that $30,000 in cash had been taken to the Caymans by Ushijima and a group of five relatives and friends and that Ushijima had given $5,000 to four of the five before they boarded the plane at O'Hare Airport. Ushijima told the jurors that he had sent the $100,000 in bearer bonds to the Caymans in June 1987 by Federal Express in a package showing the contents to be $100. He denied knowing there was a Customs form for reporting the transportation out of the United States of more than $10,000 in cash or negotiable instruments.

## II. *Analysis*

### A. *Defendants' pre-trial motions*

Prior to trial, Goulding moved to dismiss his indictment on the ground that he was the victim of selective prosecution, vindictive prosecution and outrageous government conduct. Ushijima also filed a motion to dismiss based on the government's alleged misconduct toward Goulding. The government conceded that if Goulding's motion were granted, Ushijima's motion to dismiss should also be granted.

In support of his motion to dismiss, Goulding claimed that the government prosecuted him because he had sued Internal Revenue Service agents Thomas Dietz and Irving Feinglass, who had audited various partnerships that Goulding formed for clients in the late 1970s and early 1980s.[1] See *Goulding v. Feinglass*, 811 F.2d 1099 (7th Cir.1987), certiorari denied, 482 U.S. 929, 107 S.Ct. 3215, 96 L.Ed.2d 701.[2] He attached affidavits alleging that those revenue agents made disparaging remarks about him during their civil audits.

In conjunction with his motion to dismiss, Goulding moved for discovery about the earlier civil audits and about each and every tax shelter investigation conducted by the Internal Revenue Service. The government agreed to provide a general description of the tax shelter investigations in the Chicago area and a description of the involvement of Agents Dietz and Feinglass in the audit of Goulding's personal and business tax returns.

In opposition to Goulding's motion to dismiss, the government submitted an affidavit of the case agent in the criminal investigation of Goulding. The affidavit showed that in the mid–1980s a group within the Criminal Investigation Division of the Internal Revenue Service investigated 230 allegedly abusive tax shelter schemes. Of that number, criminal investigations were begun against 46 persons, and 10 of these investigations, including the one against Goulding, resulted in the initiation of an undercover operation. During the criminal investigation, the Internal Revenue Service learned that James Evegelatos, a cooperating defendant in the Springfield, Illinois, district of the Internal Revenue Service, had information about Goulding's criminal tax shelter and money-laundering activities. Evegelatos told an Internal Revenue Service agent that Goulding claimed to have an elaborate scheme to move money around the world to hide it from the government. The Internal Revenue Service thereupon initiated the undercover investigation described above.

In view of the aforesaid information, the district court denied defendants' motions to dismiss for selective and vindictive prosecution and outrageous government conduct. The court explained that there was no evidence that the Internal Revenue Service was wrong in any of its activities and that the mere fact that defendant Goulding sued the Internal Revenue Service and was later the subject of a criminal indictment did not justify granting his motion to dismiss. The judge also concluded that Goulding was treated no differently than other attorneys who set up similar tax shelters.

At the same time, however, the district court found that Goulding was entitled to limited discovery. Because of a dispute between the parties as to the type of discovery warranted, the matter was referred to a magistrate, who narrowed the discovery to

---

**1.** The civil audits concerned a string of limited partnerships formed by Goulding. The audits resulted in penalties being assessed against Goulding for negligently preparing income tax returns in connection with three of the partnerships. The penalties were upheld in *Goulding v. United States*, 717 F.Supp. 545 (N.D.Ill.1989), affirmed, 957 F.2d 1420 (7th Cir.1992).

**2.** In the suit Goulding tried to remove Dietz, Feinglass and their supervisor, Irwin Solomon, from the audits of Goulding and his clients. He wrote Internal Revenue Service officials claiming they were prejudiced and were harassing him and eventually filed a $17 million lawsuit against the three, claiming that his Fifth Amendment rights had been violated by their acts. However, the complaint was dismissed by the district court in September 1985 for lack of federal subject matter jurisdiction. We affirmed, holding that Goulding had not been deprived of a liberty interest. This Court mentioned that the Internal Revenue Service was clearly justified in investigating Goulding's transactions and the limited partnerships because of their potentially abusive tax schemes. *Goulding v. Feinglass*, 811 F.2d at 1103.

four categories. After the magistrate's report was rendered, the district court allowed discovery of certain statistical information but forbade discovery as to the fraud referral of Goulding to the Criminal Investigation Division. Goulding filed a motion to reconsider, but it was denied. In a post-trial motion, Goulding attempted to re-visit the discovery issue. His motion and a subsequent motion to reconsider were, however, denied.

Defendants now appeal both the district court's denial of the motion to dismiss and its denial of expansive discovery regarding Goulding's claim of retaliation. To prevail on his claim of selective prosecution, Goulding needed to show that the Internal Revenue Service's criminal investigation of him had both a discriminatory purpose and a discriminatory effect. *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547. To prevail on his claim of vindictive prosecution, Goulding needed to show that he was prosecuted to punish him for exercising a protected right. *United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74. To compel discovery on either claim, Goulding had to show that there was a "colorable basis" for the claims. *United States v. Heidecke,* 900 F.2d 1155, 1159 (7th Cir.1990).

■ The district court correctly determined that Goulding failed to demonstrate that the government was acting selectively or vindictively in the present case. Goulding failed to show either discriminatory purpose behind the prosecution or a discriminatory effect. To support his claim of discriminatory intent, Goulding offered evidence that Agents Dietz and Feinglass acted with improper motives in their original investigation. This Court, however, previously reviewed this evidence and ruled that the agents were merely fulfilling their duties in investigating potentially abusive tax schemes. *Goulding v. Feinglass,* 811 F.2d 1099, 1104 (7th Cir.1987). Moreover, even if Goulding could convince this Court that Agents Dietz and Feinglass harbored ill will towards Goulding, Goulding failed to demonstrate that these agents had any influence on the bringing of this prosecution. In fact, it is clear the agents were not involved in the decisions to begin a criminal investigation or to prosecute—Goulding, however, makes no claim that the prosecutors who actually made the decision to bring charges against him acted vindictively. Furthermore, Goulding made no showing of discriminatory effect (he failed to show, for example, that other similarly situated persons were not prosecuted). In the end, Goulding's claims rest on little more than the fact that the criminal investigation was started sometime after he brought suit against the IRS agents and only meager evidence that those agents disliked him. Given the flimsiness of his claims, the district court was completely within its authority when it denied Goulding's motions to dismiss the prosecution.

■ The district court's determinations regarding discovery were also correct. Since Goulding had not shown that he would not have been prosecuted absent a retaliatory motivation, the district courts determination regarding discovery is in accord with the controlling case in this Circuit, *United States v. Benson,* 941 F.2d 598, 612 (7th Cir.1991), amended, 957 F.2d 301 (1992); accord *United States v. Greene,* 698 F.2d 1364, 1368 (9th Cir.1983); *United States v. Cyprian,* 23 F.3d 1189, 1195–96 (7th Cir.1994). Moreover, to the extent that Goulding sought to discover internal government documents, the district court correctly held that Federal Rule of Criminal Procedure 16(a)(2) precluded the production of the Internal Revenue Service's criminal referral documents.

In conclusion, this Court, like Chief Judge Moran, remains unconvinced by Goulding, Ushijima or the *amici curiae* [3] claims that Goulding's civil rights suit against Dietz and Feinglass prompted this indictment.

### B. *Validity of indictment*

■ The defendants next make various attacks on the validity of the indictment

---

3. The National Association of Criminal Defense Lawyers and the Illinois Attorneys for Criminal Justice filed briefs supporting a probe of the government's motives in indicting the defendants, but our conclusion is that the matter was satisfactorily handled below.

against them. These claims, however, are without merit. Relying on *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292, defendants first claim that their convictions for conspiracy under Count One must be overturned because the indictment failed to charge them with conspiracy to defraud the government out of property. *McNally,* however, concerned the scope of the mail fraud statute. The defendants here, on the other hand, were charged under 18 U.S.C. § 371 with a conspiracy "to defraud the United States, or any agency thereof in any manner or for any purpose." And *McNally* makes clear that the property requirement of the mail fraud statute does not apply to 18 U.S.C. § 371. 483 U.S. at 358 n. 8, 107 S.Ct. at 2881 n. 8.

■ Relying upon *United States v. Minarik,* 875 F.2d 1186 (6th Cir.1989), defendants next argue that they could be convicted under 18 U.S.C. § 371 only if they violated a specific tax provision since they have no general duty to assist the IRS in its effort to collect taxes. *Minarik,* however, has been narrowly limited to its own facts. *United States v. Sturman,* 951 F.2d 1466, 1473–1474 (6th Cir.1991), certiorari denied, —— U.S. ——, 112 S.Ct. 2964, 119 L.Ed.2d 586. And unlike *Minarik,* the government here did not shift its theory between the "to commit any offense against the United States" clause and the "to defraud the United States" clause in 18 U.S.C. § 371. An extension of *Minarik* beyond its facts is not warranted here. Cf. *United States v. Reynolds,* 919 F.2d 435, 438–439 (7th Cir.1990), certiorari denied, 499 U.S. 942, 111 S.Ct. 1402, 113 L.Ed.2d 457.

■ The defendants also argue that they lacked fair warning that their actions violated 18 U.S.C. § 371. However, 18 U.S.C. § 371's prohibition against defrauding the government gives any person of reasonable intelligence adequate notice that a scheme to frustrate the collection of taxes on illegally derived income is prohibited. *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989; cf. *United States v. Hurley,* 957 F.2d 1, 4–5 (1st Cir.1992), certiorari denied, —— U.S. ——, 113 S.Ct. 60, 121 L.Ed.2d 28. Moreover, since the defendants throughout the course of their conspiracy claimed that they were "laundering" and "cleaning" money, they had actual notice that their conduct was illegal. The defendants' various attacks on Count One of the indictment are thus without merit.

■ The defendants next challenge the mail fraud charged in Counts Two through Sixteen on the ground that 18 U.S.C. § 1341 does not apply to intangible property.[4] This challenge fails because Count Two charged a scheme to obtain money and property, namely income taxes. As we held in *United States v. Bucey,* 876 F.2d 1297, 1310 (7th Cir.1989), certiorari denied, 493 U.S. 1004, 110 S.Ct. 565, 107 L.Ed.2d 560, a similar indictment charging a scheme to "defraud the United States of money and property, that is, income taxes" was sufficient to state a valid charge.

C. *Sufficiency of evidence to show conspiracy to defraud the United States*

■ Although neither defendant challenged the sufficiency of the evidence as to Count One during the trial, both make such claims to this Court (Goulding raised the issue for the first time in a post-trial motion and Ushijima raised it only in an untimely post-trial motion). In such circumstances, we review only for plain error, and defendants must demonstrate a manifest miscarriage of justice. *United States v. Caudill,* 915 F.2d 294, 296 (7th Cir.1990).

■ Viewing the evidence in the light most favorable to the government, there was overwhelming evidence that from December 1986 until August 1987 defendants engaged in a conspiracy to defraud the federal government of taxes by laundering money from the United States through the Cayman Islands. They aided Ryder in his efforts to evade the payment of income taxes on $400,000, money they knew was from illegal bookmaking activity. They arranged for the formation of fictitious corporations and for cor-

---

**4.** See Ushijima's App. A 12, and the same charge was incorporated by reference in Counts Three through Sixteen (Ushijima's App. A 17–30).

porate bank accounts here and in the Cayman Islands to launder money and to show that actual taxable income was only nontaxable corporate loans. The defendants warned Ryder to avoid using the international mails and telephones as to the Caymans while suggesting to him how to make the newly formed corporations appear legitimate, although they had no purpose except to "clean" Ryder's money. They violated currency laws about transportation of cash and monetary instruments out of the country; they admitted unethical and illegal conduct on behalf of other clients; they admitted they were "cleaning" and "laundering" Ryder's illegal unreported income and that the attorney-client privilege was inapplicable to their conduct but nevertheless would be used by them to avoid investigation. Taken together, this evidence is clearly sufficient to establish that the defendants conspired to defraud the government.

The evidence also showed that defendants believed that Ryder owed taxes and that they conspired to deprive the government of information needed to collect the taxes and to deprive the government of those taxes. Goulding recognized that taxes, penalties and interest due on Ryder's $400,000 might total $400,000 and stated that his fee for laundering the money was cheaper than paying Ryder's taxes, penalties and interest. The defendants did not report the monetary transfers out of the United States and concealed the ownership of Ryder's money by creating bank accounts, corporations, nominee stockholders and false loan documents. They also coached Ryder to prevent the government from learning of his untaxed hoard of illegally obtained money. This was all done to keep the government from assessing and collecting taxes on Ryder's $400,000 of illegal income. There was clearly adequate evidence to support defendants' convictions under the conspiracy to defraud clause in 18 U.S.C. § 371. Cf. *United States v. Bucey*, 876 F.2d at 1312.

D. *Sufficiency of evidence to show the mailings were in furtherance of the scheme to defraud*

The defendants also contend that their mail fraud convictions must be reversed because the charged mailings in Counts Two through Sixteen were not in furtherance of any scheme to defraud. A use of the mails supports a mail fraud conviction if, as here, it is an essential part or a step in the scheme. And a review of the mailings involved here makes clear that they were essential to the scheme.

Ushijima mailed bank signature cards for the Caymans' bank account to Ryder, and those signature cards had to be signed and returned to Ushijima so that he could use them in the Caymans to open a bank account for a deposit of the money to be laundered, and so that he could subsequently withdraw money to be returned to the United States. He also mailed to Ryder a bank deposit ticket showing that the first sum of money to be laundered was deposited into the Cayman bank accounts. These mailings were definitely in furtherance of Ushijima's and Goulding's scheme.

Goulding mailed proposed articles of incorporation to Ryder to be filed in Minnesota in order to form Tarbet U.S., the Minnesota corporation which received the laundered money from the Caymans and transferred it back to Ryder in the guise of a loan from Tarbet U.S. Goulding also mailed Ryder promissory notes showing the purported loans of Ryder's laundered money. In addition, he mailed Ryder a promissory note to be used for future money laundering. There can be no doubt but that these mailings too were in furtherance of the scheme to defraud.

Ushijima mailed to Ryder a "wish letter" to be signed by Ryder and returned to Ushijima, to be sent to the shell corporation in the Caymans. At his request, Ryder mailed the signed "wish letter" along with additional instructions and the account number of the Minnesota corporate bank account back to Ushijima. These mailings also clearly furthered the return of laundered money to the United States without taxation.

Mailings in other mail fraud counts included billing invoices for alleged professional legal services sent to Ryder from Goulding and from Ushijima. Another mailing was a letter demanding payment for such services.

These mailings concealed defendants' illegal activity behind the practice of law. As Ushijima stated, by acting as lawyers representing a client, defendants could use a claim of attorney-client privilege to avoid a criminal investigation. Indeed Goulding used such a claim to avoid answering one question by an Internal Revenue agent about his dealings with Ryder. In order to make the scheme look legitimate, defendants had Goulding do some nominal legal work for Ryder to provide a cover for the $5,000 paid to Goulding on February 24, 1987. They also suggested having Tarbet C.I. engage in a nominal business transaction with Ryder's employer or make a small real estate investment in the Caymans, again for legitimacy. Goulding's fee was characterized as a less expensive alternative for Ryder than paying taxes, penalties and interest to the Internal Revenue Service. The billing invoices clearly served to conceal Ushijima's and Goulding's scheme from the government.

Ushijima also mailed various documents to Ryder, stating in the cover letters that it was necessary for Ryder to sign and return them to Ushijima to arrange the movement of the second amount of money through the Caymans. Goulding mailed to Ryder an Internal Revenue Service form containing a new federal employer identification number. The number was necessary for Ryder to maintain a corporate bank account in Minnesota in the name of Tarbet U.S. and to receive the laundered money from Tarbet C.I. in the Caymans. Ushijima likewise mailed a letter to Ryder informing him that another sum of money, $118,000, would soon be received in the Tarbet U.S. account. Ryder was also instructed in that letter to complete and return the fictitious promissory notes regarding the two transfers of money. Again, these documents were obviously a part of the defendants' scheme.

Although Ryder supposedly insisted that materials be sent by mail instead of some other means, defendants voluntarily used the mails for their correspondence. Ryder had only requested that some documents be mailed and the defendants offered to mail other documents. They also mailed all the billing invoices without any discussion with Ryder. While Ryder may have provided the defendants with an opportunity to commit the crime, that is no basis for invalidating the mail fraud convictions. *United States v. Peters,* 952 F.2d 960, 963 (7th Cir.1992), certiorari denied, —— U.S. ——, 112 S.Ct. 1277, 117 L.Ed.2d 503; *United States v. Anderson,* 809 F.2d 1281, 1287–1288 (7th Cir.1987).

E. *Entrapment defense*

■ Goulding insists that he and Ushijima should have been acquitted because they were entrapped. However, they did not raise the defense of entrapment below even though Chief Judge Moran suggested the possibility. Neither defendant offered evidence as to entrapment, and Goulding withdrew his entrapment jury instruction at the jury instruction conference. Moreover, Goulding and Ushijima have failed at any point to demonstrate a lack of pre-disposition or government inducement. In fact, Goulding's predisposition is shown because the laundering scheme through the Caymans originated with him. It was Goulding who told Ryder that he had a system to move money around the world to hide it from government taxation. The possibility of Ryder's filing amended returns and declaring the unreported income was only mentioned while pressing the advantages of his Cayman Islands scheme. Ushijima's predisposition was shown by his presentation to Ryder on February 24, 1987; and in his conversation with him on May 18 he admitted that he had been concealing assets and laundering money, including illegal untaxed income, in almost every tax haven around the world for more than 20 years. The defendants also failed to establish government inducement. Unlike the cases relied on by the defendants, *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848, and *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174, there was no resort here to sympathy, no elaborate inducement by the government or any refusal or hesitancy by either defendant.

Nor is this Court convinced by defendants' claim that they believed their actions were legal. Although Ushijima once stated that the corporations they formed were not phony

and that it was not illegal to form them or to open bank accounts in the Caymans, he admitted that the purpose for which they were opened and what was done thereafter determines whether their use is legal or illegal. As stated in *United States v. Bucey,* " 'Acts which are themselves legal lose their legal character when they become constituent elements of an unlawful scheme.' " 876 F.2d at 1312 (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777). And since the defendants acknowledged that they were "cleaning" the money, a jury could easily find that they understood their actions to be illegal.

Finally, since the defendants showed their readiness and willingness to engage in this crime, defendants' reliance on *United States v. Hollingsworth,* 9 F.3d 593 (7th Cir.1993), rehearing en banc granted and decision vacated January 10, 1994, is of no avail (no matter what the eventual disposition of that case is). And despite the suggestion of one of the *amici,* this decision will not impair the attorney-client privilege. That privilege does not cover conduct by attorneys and clients or communications between them which were made in furtherance of fraud. *United States v. Noriega,* 917 F.2d 1543, 1550–1551 (11th Cir.1990). Here dishonest lawyers attempted to use the attorney-client privilege to conceal their scheme.

Both defendants took the opportunity to commit an offense when offered the chance. An entrapment defense cannot prevail in such circumstances. See, *e.g., United States v. Evans,* 924 F.2d 714, 717 (7th Cir.1991).

### F. *International monetary transportation reporting requirements*

Defendants submit that their convictions on Counts Seventeen and Eighteen for illegally transporting currency and monetary instruments out of the United States were unwarranted under 31 U.S.C. §§ 5316(a) and 5322(a). They assert lack of evidence and inadequate jury instructions and question whether the requisite mental state was established.

#### (a) *Sufficiency of the evidence*

■ Despite the defendants' arguments to the contrary, there was sufficient evidence to convict. The evidence shows that they caused $30,000 in cash and $100,000 in bearer bonds to be transported from the United States to the Cayman Islands in March and June 1987. The evidence established that they knew that in such instances reports of the transportation had to be made to the government. Moreover, they made clear in advance that they were not planning to comply with the reporting requirement. Their convictions under Counts Seventeen and Eighteen were therefore justified.

#### (b) *Jury instructions*

■ Defendants complain that the trial court should have more fully instructed the jury regarding ignorance of the law and requisite mental state. In particular, they assail Goulding Instruction 22—even though it was tendered by Goulding himself.[5] Defendants contend that the district court should have instructed the jury that the government had a duty to inform the defendants of Customs form 4970 and that it had to find that the defendants knowingly failed to file that form. Goulding Instruction 22 permitted the jurors to convict the defendants for the non-filing of any currency declaration form. Since both defendants agreed to the text of this instruction, they may not attack it now. *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508.

In any event, the instructions given pertaining to Counts Seventeen and Eighteen were entirely adequate to inform the jury of the applicable law. No more is required. *United States v. Rice,* 995 F.2d 719, 724 (7th Cir.1993).

#### (c) *Goulding's knowledge*

Goulding states that there was no evidence he had knowledge of the general reporting

---

**5.** Goulding Instruction 22 stated that the government had to prove that the defendant had knowledge that if more than $10,000 in currency or other monetary instruments was transported out of the country in a manner shown by the evidence, he was required to file a Customs Service report (R. 121 and Tr. 1077).

requirement, but this is untrue. The evidence showed that Goulding knew it was illegal to transport more than $10,000 out of the country without reporting it to the government. Ushijima told Ryder that in Goulding's presence on February 24, 1987. Goulding also knew that bearer bonds were negotiable instruments and had to be reported because on February 24 he and Ushijima discussed that very subject. Goulding's knowledge also was shown by his refusal to take the bearer bonds to the Caymans on behalf of Ryder, saying that an attorney should know it was illegal to do so.

■■■ Moreover, when one defendant is a member of the conspiracy and his co-defendant commits an offense in furtherance or as a consequence of the conspiracy, the defendant can be found guilty of the offense. *Pinkerton v. United States,* 328 U.S. 640, 647–648, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). Under the *Pinkerton* instruction which was given here, if the jury convicted both defendants of the Count One conspiracy, and convicted either on Counts Seventeen and Eighteen, the jury was entitled to convict the other defendant on Counts Seventeen and Eighteen. Such an instruction is still permissible. *United States v. Macey,* 8 F.3d 462, 468 (7th Cir.1993). Consequently, Ushijima's knowledge of the reporting requirement and his culpability were attributable to Goulding and vice versa.

### G. *Goulding's cross-examination of government witnesses*

Goulding argues that his convictions must be reversed because Chief Judge Moran granted the government's pre-trial motion *in limine* to bar arguments or evidence by the defense counsel regarding government misconduct and entrapment. There was, however, no abuse of discretion.

The claim that the court prevented the defense from presenting an entrapment defense is simply not correct. Although the district court did not allow the defense to mount an inquiry into the mental states of the investigating officers since such evidence was irrelevant, the court denied the government's motion to prohibit the defendants from raising an entrapment defense at all.

The court made clear that it would not rule in advance that the defendants could not argue entrapment, even if at the end of trial they might not be entitled to an entrapment instruction (Tr. 28).

Nor were the court's rulings regarding government misconduct erroneous. Goulding was not—despite his claims—prevented from cross-examining any witnesses regarding an animus against him. In fact Goulding did not attempt such cross-examination or make any such offer of proof. Moreover, since Goulding never demonstrated at trial that he had any lines of cross-examination about bias which he was prevented from pursuing, he has therefore waived the right to do so now. *United States v. Junne,* 458 F.2d 1156, 1157 & n. 5 (3d Cir.1972).

The various other claims of error suggested by defendants' briefs are equally meritless and do not warrant discussion. Moreover, in light of the overwhelming evidence of guilt, the assailed evidentiary rulings were harmless. *United States v. Saunders,* 973 F.2d 1354, 1359 (7th Cir.1992), certiorari denied, — U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171.

### H. *Government's closing argument*

■■■ Goulding attacks the government's closing argument, claiming that the jury was twice wrongly told that "Goulding acted knowing his conduct was illegal." He also assails the government's rebuttal statement that it would have been appropriate for him to advise Ryder to file amended returns and pay back taxes.

The claim that the government twice argued that Goulding acted knowing his conduct was illegal is incorrect. Instead, the prosecutor only argued that defendants knew what the law was on tax fraud since both were tax lawyers and Goulding had been a former Internal Revenue Service special agent and Certified Public Accountant. The government did not state that Goulding admitted that what he was doing for Ryder was illegal.

■■■ Goulding next attacks the government's summation statement that "I [Gould-

ing] am laundering it, and that's illegal." There was no objection. Goulding had told Ryder that being an attorney, Goulding had to assume that the $400,000 "has been or already is, you know, reported income." However, Ryder had already told Goulding that the money had not been reported as income. Therefore it was permissible for the government to argue that

> [Goulding] tells this to [Ryder] because he is covering himself. I have to assume it is legal because if it is not legally reported income, I am laundering it and that's illegal. (Tr. 925)

Given the context in which this statement was made, it is not an impermissible characterization of the evidence. At any rate, the government attorney was paraphrasing what Goulding told Ryder on December 18, 1986, that when the bank returned the money from the Caymans in the form of a loan, it "cleaned the money."

■ Goulding also challenges the government's rebuttal argument that an honest lawyer would have advised Ryder to file amended tax returns, declare the unreported income and pay the taxes, penalties and interest due. Goulding now contends that this argument was unfair because such advice from Goulding to Ryder was not available since if Ryder had filed amended returns, he would be incriminated and exposed to criminal prosecution. Goulding, however, had acknowledged in his conversations to Ryder that reporting the income was the safest course of action. Moreover, the government attorney's argument was invited because defendants' lawyers had argued that their conduct was the legitimate practice of law.

In any event, Goulding's conviction should be upheld because in view of the overwhelming evidence of his guilt, the isolated comments of the government attorney did not inject any unfairness into the proceedings—especially since the trial court instructed the jury to base its decision on the evidence alone, and not on counsel's statements.

### I. *Refusal to give Goulding's advice of counsel instruction*

■ Goulding alleges that the trial court erred in refusing to give his tendered in-struction No. 20, outlining a defense of good faith reliance upon advice of counsel. However, by failing to make an objection below, Goulding did not preserve the issue for appeal. Moreover, the evidence did not support such an instruction: there is no evidence that Goulding consulted two other attorneys, Ushijima and Fred Harbecke, before initiating this scheme or that he made a full report to them of all the facts and that he received legal advice to proceed from either. Indeed when he consulted Harbecke, Goulding did not tell him that Ryder's money was untaxed income from an illegal source, even though Ryder had already told Goulding so. Furthermore, Ushijima testified that he was not an attorney for Goulding and did not meet with Goulding until after Goulding had devised the fraudulent scheme and described it to Ryder. Since the tendered good faith instruction was not supported by the evidence in the record, the trial court's refusal to give it was not error. *United States v. Martinez*, 988 F.2d 685, 698 (7th Cir.1993), certiorari denied, —— U.S. ——, 114 S.Ct. 125, 126 L.Ed.2d 89.

### J. *Adequacy of wilfulness instructions*

■ Count Seventeen of the superseding indictment charged defendants with transporting $37,000 in cash from Chicago to the Cayman Islands on March 17, 1987, and wilfully failing to file the report required by 31 U.S.C. § 5316(a) and Section 5322(a). The latter section punishes wilful violations of Section 5316. Count Eighteen charged defendants with transporting $118,000 in cash and bearer bonds from Chicago to the Cayman Islands and with wilfully failing to file the required report. Defendants now dispute the validity of the wilful instructions given by Chief Judge Moran in view of *Ratzlaf v. United States*, —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615, which was decided after this trial. The wilfulness provision in Section 5322(a) means that to convict a defendant "the jury had to find he knew the structuring in which he engaged was unlawful." —— U.S. at ——, 114 S.Ct. at 663. Earlier the *Ratzlaf* opinion stated that for valid convictions under Section 5322(a), a defendant must know "of his duty not to *avoid*

triggering such a report." — U.S. at ——, 114 S.Ct. at 662 (emphasis supplied). Here Chief Judge Moran gave the following instructions on wilfulness without any objection by defendants:

(1) An act is done willfully if done voluntarily and intentionally with the purpose of *avoiding* a known legal duty.

(2) In order to prove the defendant had the requisite willful intent required for conviction under Counts Seventeen and Eighteen, the government must prove beyond a reasonable doubt that the defendant had knowledge that, if more than $10,000 in currency or other monetary instruments was transported out of the country—in the manner in which you find from the evidence that the currency or monetary instruments was transported out of the country—he was required to file a Customs Service Report.

The instructions comported exactly with the *Ratzlaf* requirement that for a valid conviction a defendant must know of his duty to report a cash transaction and "of his duty not to avoid triggering such a report." — U.S. at ——, 114 S.Ct. at 662. Chief Judge Moran's use of "avoiding" in the first instruction comported with *Ratzlaf* and also with the Seventh Circuit's pattern jury instructions.

The second instruction given below also comports with *Ratzlaf* because it provided that the government must prove beyond a reasonable doubt that the defendant "had knowledge of his duty to report the transportation of cash in excess of $10,000 out of the country." Defendants cannot say that they were ignorant of the reporting requirement because Ushijima, in Goulding's presence, told Ryder on February 24, 1987:

The law states that ... if you take more than $10,000 out of this country you're suppose ... to declare it.... And [the courier's] not gonna declare it. And if he's caught then it can be seized. That's a risk.

(Transcript of 2–24–87 at 45). In addition, both defendants acknowledged that the reporting requirement applied to any negotiable instrument, including bearer bonds. Since they "knew the structuring transaction in which ... [they] engaged was unlawful,"

*Ratzlaf,* — U.S. at ——, 114 S.Ct. at 663, their knowledge of the law was shown.

### III. *Conclusion*

The convictions and sentences of both defendants are affirmed.