**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**David L. REYNOLDS,**
**Defendant–Appellant.**

No. 90–1479.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1990.

Decided Nov. 28, 1990.

**436**

Stephen J. Liccione, Joseph R. Wall, Asst. U.S. Attys., Milwaukee, Wis., for plaintiff-appellee.

William E. Callahan, Jr., Davis & Kuelthau, Milwaukee, Wis., for defendant-appellant.

Before CUMMINGS, EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

For more than a decade Milwaukee has participated in the community development block grant program administered by the Department of Housing and Urban Development. The City selects urban projects that meet federal criteria and pays a contractor to do the work; the federal government reimburses the City on certification that the work has been done according to the federal standards. A pot of money attracts many people, not all of them interested in fulfilling the statutory objectives. David Reynolds was one such person.

Reynolds formed the Phoenix Redevelopment Project, Inc., ostensibly to renovate housing in the 10th Aldermanic District of Milwaukee. That the extent of a federal redevelopment project should be limited by political boundaries in Milwaukee—boundaries having nothing to do with housing that could benefit from rehabilitation—seems to have drawn little attention at Milwaukee's Community Development Agency or at HUD. The link between Phoenix and the 10th District reflects the link between Reynolds and Michael McGee, the Alderman of the 10th District. Reynolds was one of McGee's confidants, able to induce action on applications for liquor licenses in his district (in exchange for baksheesh). Phoenix may have been another vehicle to send money in McGee's direction.

Reynolds arranged for two of Phoenix's suppliers to submit false invoices for supplies. Reynolds also forged some invoices on letterheads he obtained from these two suppliers. He submitted both the fraudulent and the forged invoices to the City for payment. Reynolds and his suppliers arranged to split the proceeds 50–50, but Reynolds reneged, paying them only ⅓ of the takings on the explanation that he needed a larger share to take care of someone from the City. The skimming led to four kinds of charges, in addition to the drearily inevitable yet pointless conspiracy charge: making false claims against the government, in violation of 18 U.S.C. § 287; embezzling federal funds, in violation of 18 U.S.C. § 641; theft from a governmental program, in violation of 18 U.S.C. § 666; and filing false income tax returns, in violation of 26 U.S.C. § 7206(1) (Reynolds, not content to rob a fund designed to assist the neediest in society, neglected to pay taxes on the booty). He was charged with and acquitted of three counts of extortion. The

42 counts on which he was convicted produced a term of four years' imprisonment, plus restitution of $52,219 and special assessments of $2,100.

■ The tax counts are the most problematic. Reynolds filed IRS form 1040EZ for each of tax years 1986 and 1987. Line 1 of this form says: "Total wages, salaries, and tips. This should be shown in Box 10 of your W–2 form(s). (Attach your W–2 form(s).)" Reynolds inserted in the space provided the amount shown on his W–2 forms, which he dutifully attached. The only other line on form 1040EZ calling for income is line 2, which reads: "Interest income of $400 or less. If the total is more than $400, you cannot use Form 1040EZ." Reynolds performed the additions and subtractions called for on the other lines, filling in the total on line 7, which reads: "Subtract line 6 from line 5. If line 6 is larger than line 5, enter 0 on line 7. This is your taxable income."

The indictment charged Reynolds with filing a return,

> which said income tax return he did not believe to be true and correct as to every material matter in that on line 7 of the return, the defendant's taxable income was represented as being $12,743.00 [in 1986; $16,185 in 1987], whereas, as he then and there well knew and believed, he had taxable income in 1986 [or 1987] in excess of that heretofore stated.

Line 7 did not call for anything other than the difference between line 6 (the personal exemption, preprinted on the form) and line 5. Line 5 came from lines 1 and 2 (added to yield line 3), from which Reynolds subtracted charitable contributions (line 4). The veracity of Reynolds' verification (by signing the return) that line 7 is "true, correct, and complete" therefore depends on the accuracy of his entry on line 1. He contends that the entry on line 1 is literally correct: he wrote down everything he had received as "wages, salaries, and tips", exactly as it appeared on the forms W–2.

To this the prosecutor has two replies. One is that by filing form 1040EZ, Reynolds represented that he had no income not called for on lines 1 and 2. The other is

that, according to expert testimony, Reynolds could have put his illegal income on line 1. Only one of these can be true. If income that is not reflected on a W–2 disqualifies someone from filing form 1040EZ, then illegal income may *not* be included on line 1 of that form. And the existence of such income indeed disqualifies a taxpayer from using form 1040EZ. It is designed for persons whose entire income appears on W–2s, plus interest income that financial institutions report on forms 1099. Anything more complex requires the taxpayer to use form 1040.

■■ The prosecutor's argument that by filing form 1040EZ a taxpayer implicitly represents that he has no additional income has more substance, but this is not the theory in the indictment. It charged that line 7, specifically, was false, and line 7 is derived arithmetically from other lines. Section 7206(1) is a perjury statute, and literal truth is a defense to perjury, even if the answer is highly misleading. *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). Using the wrong form does not violate § 7206(1). *Hartford–Connecticut Trust Co. v. Eaton*, 34 F.2d 128, 130 (2d Cir.1929). If the form has an open-ended line calling for § 61 income, and the taxpayer leaves some income out, § 7206(1) applies. *United States v. Young*, 804 F.2d 116, 119 (8th Cir.1986). Form 1040EZ is anything but open-ended, however. The right charges are tax evasion (26 U.S.C. § 7201) and failure to supply information required by law (26 U.S.C. § 7203). Reynolds did not reveal his complete income (§ 7203) and evaded taxation on that income (§ 7201). Neither the indictment nor the charge to the jury set out the elements of these offenses, so the problem is deeper than a citation to the wrong statute in the indictment. We vacate Reynolds' tax convictions, without foreclosing indictment and trial for the offenses that match the prosecution's theory of the case.

■ Leaving tax, we turn to embezzlement of federal funds, which violates 18 U.S.C. § 641. Reynolds defended against the embezzlement counts by observing that Milwaukee, and not HUD, paid Phoenix's

invoices. Although the federal government reimbursed Milwaukee, the money in Phoenix's hands was Milwaukee's and therefore, Reynolds concludes, outside the scope of § 641. Section 641, which punishes those who purloin "money, or any thing of value of the United States or of any department or agency thereof", is a problem child when applied to grantees or other independent contractors. What does it mean to say that Phoenix embezzled funds that the City and HUD handed over willingly? Isn't this just a back door way to cumulate the punishment assessed by § 287, which penalizes false claims? Yet Reynolds does not contest the application of § 641 to false claims, and he does not challenge this circuit's approach to defining "money ... of the United States": if the United States supplies the funds and exercises supervision and control over their use in the hands of grantees, they remain "money ... of the United States". E.g., *United States v. Kristofic*, 847 F.2d 1295 (7th Cir.1988); *United States v. Wheadon*, 794 F.2d 1277, 1284–85 (7th Cir.1986); *United States v. Bailey*, 734 F.2d 296 (7th Cir.1984).

Community block grant funds come with the strings that usually tie up the use of federal money. 24 C.F.R. Part 570. Recipients must certify that they will put the dollars to particular uses. If they do not, the United States retains a right to recoup. Reynolds does not dispute these things— does not dispute that § 641 would apply, if Phoenix had received the money from HUD. Because Milwaukee fronted City money, and obtained payment later, Reynolds believes that the link was broken. A jury could decide otherwise, however. The United States puts up *all* of the money Reynolds received, even paying the salaries of the employees of Milwaukee's Community Development Agency. More than a decade ago, when Milwaukee entered the block grant program, it may have had to inject some of its own money to pay the first month's invoices while awaiting reimbursement. Ever since then, however, no new City money has been invested. Funding rolls over; federal money Milwaukee gets in July (on account of invoices paid in June) is available to pay new invoices submitted in August. Everything Milwaukee's Community Development Agency receives, and everything it pays out, is covered by federal rules and subject to an obligation to repay the United States if anything goes wrong. As a practical matter, the dollars are as much "money ... of the United States" as if Phoenix had billed HUD directly. Whatever doubts we may have about the use of § 641 to increase the penalties provided by § 287 are no reason to draw a line that depends on the existence of a local intermediary that serves as no more than a disbursing office for HUD.

■ A third line of attack goes to the conspiracy conviction. The indictment charged Reynolds with conspiring to defraud the United States, in violation of 18 U.S.C. § 371. Section 371 makes it a crime for "two or more persons [to] conspire either to commit any offense against the United States, or to defraud the United States". Reynolds contends that when the prosecutor challenges conduct that violates a specific statute (such as § 287 or § 641), the indictment must charge a conspiracy "to commit [that] offense against the United States", rather than a generic conspiracy to defraud. Reynolds invokes *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989), in support of this conclusion.

Stated the way Reynolds frames it, the argument cannot be right. There are no common law federal crimes. Thus there will *always* be a specific substantive offense that the defendants conspired to commit. If the prosecutor must charge a conspiracy to commit the specific crime, there can never be a charge of conspiracy to defraud the United States. Some statutory language is redundant, but we hesitate to read out of § 371 the language that has been the foundation for so many convictions. Moreover, reading § 371 this way would do defendants no favors. If agreement to violate each specific statute is a distinct offense, then Reynolds should have been charged with *three* conspiracies rather than just one, for his acts transgressed §§ 287, 641, and 666. Why would defendants be better off facing three conspiracy

charges rather than one generic charge of conspiring to defraud?

Although some language in *Minarik* suggests that the sixth circuit thought it better practice to charge a conspiracy to violate a particular statute, the *holding* of that case is only that the prosecution's theory changed so often that the defendant lacked notice of the charge against which he had to defend. Reynolds had plenty of notice. The conspiracy charge and the prosecution's theory were stable from indictment through conviction; the 39 specific charges laid under §§ 287, 641, and 666 gave Reynolds ample notice of the facts that the prosecution would contend constituted the fraud. Reynolds had adequate notice, and an alteration in the phraseology of the conspiracy charge could not have assisted his defense.

■■■ When listing the charges against Reynolds we called the conspiracy charge inevitable yet pointless. It is inevitable because prosecutors seem to have conspiracy on their word processors as Count I; rare is the case omitting such a charge. It is pointless because, under the Sentencing Guidelines, the conspiracy is grouped with the substantive offense for the purpose of computing the offense level. U.S.S.G. § 3D1.2(b) and Application Note 4. Although the existence of a conspiracy allows the prosecution to use co-conspirator statements that would otherwise be hearsay, it is not necessary to *charge* a conspiracy in order to take advantage of Fed.R.Evid. 801(d)(2)(E); it is enough to show that a criminal venture existed and that statements took place during and in furtherance of that scheme. Conspiracy, once a formidable weapon in the prosecutor's arsenal, has become a distraction, useful only to obtain an extra $50 special assessment and to generate complex issues for appeal. The $50 hardly compensates for the costs the allegation imposes on the parties and the judicial system. Our portfolio does not include making prosecutorial decisions, however, and we are satisfied that the conspiracy as charged comports with the United States Code.

■ None of Reynolds' other arguments requires extended comment. He contends, for example, that the court should have "struck the jury panel" because of pretrial publicity. His scam was front-page news in Milwaukee, apparently because of the potential role of Alderman McGee. Yet Reynolds does not contend that the jurors actually seated were unable to decide the case fairly on the record. There is no principle that high-visibility cases are untriable or must be tried in another state. See *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Anyway, Reynolds did not request a change of venue. He had a fair trial.

The tax convictions are reversed. The remaining convictions are affirmed. The sentences are vacated, and the case is remanded for resentencing in accordance with our policy of giving the judge an opportunity to reformulate the sentencing package knowing which charges held up.