**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-4634

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CATHERINE ELIZABETH CHOLLET, a/k/a Liza Chollet,

Defendant - Appellant.

No. 24-4635

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICHAEL ELLIOT KOHN,

Defendant - Appellant.

No. 24-4636

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID SHANE SIMMONS, a/k/a Shane Simmons,

Defendant - Appellant.

Appeals from the United States District Court for the Western District of North Carolina, at Statesville.  Kenneth D. Bell, District Judge.  (5:22-cr-00060-KDB-SCR-2; 5:22-cr-00060-KDB-SCR-1; 5:22-cr-00060-KDB-SCR-3)

Argued:  May 6, 2026                                   Decided:  June 9, 2026
                          Amended:  June 9, 2026

Before NIEMEYER, THACKER, and RUSHING, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Thacker and Judge Rushing joined.

**ARGUED:**  Justin Gelfand, MARGULIS GELFAND LLC, St. Louis, Missouri; Karl Walter Dickhaus, DICKHAUS LAW PARTNERSHIP, L.P., St. Louis, Missouri, for Appellants.  Todd Alan Ellinwood, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Richard Lamb Brown, Jr., LAW OFFICES OF RICHARD BROWN, Monroe, North Carolina, for Appellant David Simmons.  A. Tysen Duva, Assistant Attorney General, Jennifer Hodge, Deputy Assistant Attorney General, S. Robert Lyons, Katie Bagley, Joseph B. Syverson, Tax Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Russ Ferguson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

2

NIEMEYER, Circuit Judge:

Michael Kohn, Catherine Chollet, and David Simmons were convicted of conspiracy to defraud the government and assisting in the preparation of false and fraudulent tax returns. On appeal of their judgments, they raise numerous issues challenging their convictions, including claims that the government violated the Appointments Clause of the U.S. Constitution in prosecuting the crimes; that venue in the Western District of North Carolina was improper; that the tax returns were technically true, as the calculations followed the tax forms; and that the district court made erroneous evidentiary rulings, among other challenges.

For the reasons given herein, we reject the defendants' challenges and affirm.

I

Michael Kohn and his daughter Catherine Chollet were tax attorneys and partners in The Kohn Partnership, LLP, a law firm in St. Louis, Missouri. David Simmons was an insurance broker residing in Jefferson, North Carolina, who worked closely with Kohn, Chollet, and The Kohn Partnership in assisting in the preparation of income tax returns on behalf of clients in various states, including North Carolina.

Years ago, the defendants designed and began marketing and implementing a "tax planning strategy" that they called the "Gain Elimination Plan" (GEP), under which well-to-do clients could reduce their taxable income with deductions for business expenses paid to limited partnerships that were created particularly for each client and that would be mostly owned by a charitable organization. In concept, as the limited partnership would

3

provide the client with intellectual property and business management services, the client would pay the limited partnership royalties and fees, which the client would then deduct as business expenses on the client's income tax return.

Under the GEP's design, the defendants would form a client-specific limited partnership of which the client would own one to two percent. A preexisting charitable organization, usually the Inter-National Foundation Corporation, would own the remainder. The clients would, at least in concept, pay royalties or management service fees to the limited partnership and then deduct those amounts as business expenses on their income tax returns. In addition, the defendants told each client that the limited partnership would need to insure the income stream to it and thus that the client would need to purchase a life insurance policy on the life of the client. Simmons, as an insurance broker, would obtain the policies, and he would share his commissions with Kohn and Chollet. To reduce further expense to the client, the defendants advised clients that the GEP had a limited life and that the client could cancel the insurance policy and buy out the charity's interest in the limited partnership for "next to nothing."

As the government proved at trial, however, the charitable organizations never agreed to become a partner in the limited partnerships. Indeed, no partnership agreements were ever signed by the clients and the charitable organization, and thus no limited partnerships existed. Moreover, the limited partnerships never provided intellectual property or management services to the clients, and the clients never made any payments of royalties and fees to the limited partnerships. Despite the absence of any economic transactions, the defendants assisted the clients in claiming an arbitrary amount of business

4

expense deductions that were false and not based on any payments made. With the fabricated deductions, the clients were able to reduce their taxable income and the amount of taxes that they paid to the IRS. The defendants offered the GEP in this form to clients for over 11 years, resulting in their clients' illegally avoiding the payment of, in the aggregate, over $22 million dollars in income taxes.

Moreover, to obtain the life insurance policy for the limited partnerships, Simmons provided false personal and financial information about the clients to the insurance companies, and he and Kohn then coached the clients on how to answer questions about their applications. Simmons received a commission on each policy in an amount representing about 90 percent of the first year's premium and then shared about $1.1 million of those commissions with Kohn and Chollet.

In view of the absence of limited partnerships and of any payments made by the clients to the limited partnerships, the government asserted that the GEPs, as implemented, lacked economic substance and thus were fraudulent.

In addition to assisting in the preparation of such false tax returns for her clients, Chollet also used the same fraudulent GEP for herself, reducing her taxable income in the amount of $350,000 over the period of five tax years.

Finally, Kohn and Chollet also prepared Simmons' tax returns on which Simmons underreported his income over several years, causing a loss to the IRS of over $480,000 in taxes.

After a two-week trial, the jury convicted all three defendants of conspiracy to defraud the federal government, in violation of 18 U.S.C. § 371; Kohn on 16 counts of

5

assisting in the filing of false tax returns, in violation of 26 U.S.C. § 7206(2); Chollet on 13 counts of assisting in the filing of false returns, in violation of § 7206(2); and Simmons on 11 counts of assisting in the filing of false returns, in violation of § 7206(2), and on 5 counts of filing false tax returns, in violation of § 7206(1).

The district court sentenced Kohn to 84 months' imprisonment, Simmons to 60 months' imprisonment, and Chollet to 48 months' imprisonment, and it imposed a term of three years' supervised release for each. The court also ordered the defendants to pay the United States over $22.5 million dollars in restitution.

From the district court's judgments dated November 14, 2024, the defendants filed these appeals.

II

The defendants contend first that their prosecution was not properly authorized by an "officer" of the United States; that the error was structural, in violation of the Appointments Clause of the U.S. Constitution and the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*; and therefore that their indictment should have been dismissed. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293, 297–98 (2017); *Probst v. Saul*, 980 F.3d 1015, 1021 (4th Cir. 2020). Particularly, they maintain that their criminal tax prosecution "had to be authorized by the Assistant Attorney General, Tax Division" (AAG-Tax) but that, at the time of their prosecution, "there was no AAG-Tax." Instead, "the Executive Branch has circumvented the Appointments Clause and the Federal Vacancies Reform Act

6

. . . by unilaterally installing 'heads' of the Tax Division." Then, they set forth the record on which they base their argument:

> For purposes of this appeal, the following facts of record are beyond dispute: the Tax Division did not have an AAG-Tax; [David] Hubbert [who allegedly authorized the prosecution] was *not* the [Deputy] AAG, Criminal at the time he authorized this prosecution; [Stuart] Goldberg *was* the [Deputy] AAG, Criminal at the time this prosecution was authorized but Goldberg did *not* authorize this prosecution.

The defendants thus assume that David Hubbert authorized this prosecution, not Stuart Goldberg, whom they say was the one who should have authorized it under Tax Division Directive No. 138. But, in contradiction of this concession that DAAG Goldberg had the authority to authorize the prosecution, they contend that the delegation of authority to DAAG Goldberg under Tax Division Directive No. 138 violated 28 C.F.R. § 0.70, which, they argue, prohibited the AAG-Tax from redelegating authority to a DAAG.

While there was an initial motions proceeding in the district court in which the court was informed that David Hubbert had authorized the prosecution, on reconsideration and with the benefit of additional information, the court found that "Goldberg was the Acting DAAG, Criminal at the time this prosecution was authorized" and that he had "authorized this prosecution as required by Directive 138." The defendants then pivoted to attacking the validity of Directive 138 on the ground that it violated 28 C.F.R. § 0.70, which, they contend, placed the authority to prosecute them only in the AAG-Tax, not the DAAG, Criminal of the Tax Division.

The defendants' arguments fail on at least two fundamental levels. First, documents in the record demonstrate that Acting DAAG Stuart Goldberg in fact authorized the

7

prosecution of the defendants in this case on November 7, 2022. And while DAAG Goldberg was the *Acting* DAAG, Criminal at the time, he was, as Acting DAAG, nonetheless authorized to approve the defendants' prosecution. And second, the delegation by the AAG-Tax in Tax Division Directive No. 138 was not prohibited by any language in 28 C.F.R. § 0.70.

The Appointments Clause of the Constitution authorizes the President, "with the Advice and Consent of the Senate, [to] appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const. art. II, § 2, cl. 2. Such "Law" provides that the President must appoint an Attorney General with the advice and consent of the Senate, *see* 28 U.S.C. § 503, and again, with the advice and consent of the Senate, must appoint 11 Assistant Attorneys General (AAGs) to "assist the Attorney General in the performance of his duties," *id.* § 506. At the time this case was initiated, one of those AAGs was designated as the head of the Tax Division (*i.e.*, the AAG-Tax), although the office was vacant. Moreover, the "functions" of the Department of Justice are also "vested" in the Attorney General, *id.* § 509, and the Attorney General is authorized to delegate those functions to "*any other officer, employee*, or agency of the Department of Justice," *id.* § 510 (emphasis added).

Section 0.70 of Title 28 of the Code of Federal Regulations (as in effect before December 10, 2025) assigned a list of functions to the AAG-Tax, including, subject to a few exceptions not applicable here, all "[c]riminal proceedings arising under the internal revenue laws." 28 C.F.R. § 0.70(b). By Tax Division Directive No. 138, the AAG-Tax,

8

acting under the authority of 28 C.F.R. § 0.70, then delegated to the "Deputy Assistant Attorney General, Criminal ('DAAG, Criminal')" most of the "powers and authority of the AAG with respect to criminal proceedings," including the "[p]rosecution of an attorney for criminal conduct committed in the course of acting as an attorney," but reserved to himself authority over a few specific matters, including "[a]ction in . . . [a] subpoena of an attorney for information relating to the attorney's representation of a client."

Thus, by delegation and subdelegation, the DAAG, Criminal or Acting DAAG, Criminal had authority to authorize criminal prosecutions arising under the Internal Revenue Code, including the prosecution of any "attorney for criminal conduct committed in the course of acting as an attorney."

On November 7, 2022, Acting DAAG, Criminal Stuart Goldberg, who had been designated to his position in the Tax Division by Attorney General Merrick Garland, specifically authorized the prosecution of the defendants for the crimes charged in the indictment returned against them on November 16, 2022.

In view of these delegations and subdelegations, and the authorization of the Acting DAAG, Criminal, we reject the defendants' contention that their prosecution was not properly authorized and therefore in violation of the Appointments Clause.

Nonetheless, the defendants fall back on their argument that Acting DAAG Stuart Goldberg did not have authority to authorize the prosecution because his authority to do so derived from Tax Division Directive No. 138, which, they argue, was inconsistent with 28 C.F.R. § 0.70(b). They contend that Tax Division Directive No. 138 was an unlawful delegation because 28 C.F.R. § 0.70 directed that the AAG-Tax "conduct[], handle[], or

9

supervise[]" "[c]riminal proceedings arising under the internal revenue laws."  While the regulation does indeed confer such authority on the AAG-Tax, there is no language that requires him to carry out those responsibilities *personally* and that prevents him from delegating functions to subordinates.  Not only would the defendants' interpretation be highly impracticable in light of the nationwide workload, but it would also be inconsistent with the broad authority to delegate given generally to the Attorney General, *see* 28 U.S.C. § 510, and with the authority to redelegate that is recognized under administrative law. Indeed, it is well-established that we will "approv[e] [a] broad subdelegation of authority within administrative agencies where [the] subdelegation is in keeping with the nature of statutory duties and with Congress' intent."  *House v. S. Stevedoring Co.*, 703 F.2d 87, 88 (4th Cir. 1983); *see also* 28 U.S.C. § 510 (authorizing the Attorney General generally to delegate functions to "any other officer, employee, or agency of the Department of Justice").

The defendants contend further that the delegation made by Tax Division Directive No. 138 violates the Appointments Clause because it permits a principal officer of the government "to delegate his authority to an inferior officer by way of an internal policy directive."  But they have provided no authority for such a proposition.  Indeed, § 510 authorizes the Attorney General, a principal officer, to delegate functions to "employee[s]," not necessarily officers at all.

In sum, the prosecution of the defendants for the crimes charged in their indictment was approved by the Acting DAAG, Criminal Stuart Goldberg, who was authorized by explicit delegation to do so.  We conclude that there was no violation of the Appointments

10

Clause or the Federal Vacancies Reform Act, nor was there an inappropriate approval of the prosecution.

## III

The defendants Kohn and Chollet next contend that the government failed to establish that the Western District of North Carolina was an appropriate venue in which to prosecute the crimes charged under 26 U.S.C. § 7206(2) because the government failed to prove that they committed any conduct element in that district. They assert that they practiced law at The Kohn Partnership located in the Eastern District of Missouri and that they lived there as well. Thus, they maintain that "all acts taken by Kohn and/or Chollet — if any — in the preparation and presentation of the tax returns at issue were taken there." As they summarize their venue argument:

> [A]ll tax returns were submitted to the IRS from St. Louis, Missouri, and the Government never established they were sent to a service center in the Western District of North Carolina (because that did not happen). Thus, the Government bore the burden of establishing *some act* of Kohn and/or Chollet that aided or assisted in procuring, counseling, or advising *the preparation or presentation* of each tax return at issue as to each count in the Western District of North Carolina — and the Government did not meet its burden.

Thus, they argue that we must reverse all their convictions under § 7206(2).

The district court submitted the issue to the jury, instructing it that, in assessing whether the government had established venue for the 7206(2) counts by a preponderance of the evidence, the jury had to "decide whether an act was committed by a defendant, or caused to be committed, in furtherance of the preparation of filing of the false tax return at issue, including whether a tax return was signed in, filed in, or mailed from the Western

11

District of North Carolina." Following the jury's verdict finding venue to be proper, Kohn and Chollet renewed a motion for judgment of acquittal on the § 7206(2) counts, arguing that the evidence was insufficient to support the jury's finding that venue was proper in the Western District of North Carolina. The court, however, denied the defendants' motion, finding that the government's evidence was sufficient to allow the jury to find that venue in the Western District of North Carolina was proper. The court stated:

> [T]he Government's evidence showed that Kohn and Chollet effectively used Simmons, and his office manager Brandi Davis . . . , as their agents in collecting tax information from the clients associated with Counts 2-12, all but one of whom lived in this District. The taxpayer who was not a resident of this District testified that he often worked through Simmons' office (which was located in this District) for tax-related matters because he had trouble getting in touch with Kohn. Thus, even if Kohn and Chollet completed the actual tax preparation in Missouri, there is ample evidence for the jury to have concluded that the Defendants either took specific actions in this District to aid or assist in the preparation of a false tax return or caused those actions to take place.

We thus must decide whether the evidence was sufficient for the jury to find by a preponderance of the evidence that a conduct element of § 7206(2) was committed in the Western District of North Carolina, and we will affirm whenever, "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found venue by a preponderance of the evidence." *United States v. Sterling*, 860 F.3d 233, 241 (4th Cir. 2017).

The Constitution provides that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, and it guarantees "an impartial jury of the State and district wherein the crime shall have been committed," *id.* amend. VI; *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules

12

permit otherwise, the government must prosecute an offense in a district where the offense was committed"). And when a crime is committed in more than one State, Congress has provided that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be . . . prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).

The controlling analysis for determining where a crime was committed begins with the identification of "the act or acts constituting [the crime]." *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998) (cleaned up). And once the "essential conduct elements" of the crime are identified, the second step is discerning where they were committed. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279–80 (1999). Venue is then proper in *any* district where *any* conduct element of the crime was committed. *See id.* at 281–82; *see also* 18 U.S.C. § 3237(a).

The offense at issue here makes it a crime to willfully (1) *aid* or (2) *assist in* or (3) *procure*, (4) *counsel*, or (5) *advise* the preparation or presentation of a false tax return. 26 U.S.C. § 7206(2). As such, we have recognized that "any such conduct constitutes a continuation of the offense and forms a basis for establishing venue." *United States v. Hirschfeld*, 964 F.2d 318, 321 (4th Cir. 1992). In *Hirschfeld*, the defendant had read § 7206(2) "too narrowly" by focusing "only on where the return was prepared, mailed, and filed." *Id.* As we explained, "[t]he prohibition by its own terms reaches conduct which consists of *aiding* and *assisting* in the preparation of a false return." *Id.*

The record here shows that even though Kohn and Chollet resided and worked in Missouri, they aided, assisted, counseled, and advised their clients in the Western District

13

of North Carolina in preparing and presenting false tax returns on their behalf.  All of the clients involved in this prosecution, with the exception of Damian Novak, lived and worked in the Western District of North Carolina.

Indeed, the evidence showed that not only were most of Kohn and Chollet's clients located in the Western District of North Carolina, so too was Simmons, who was instrumental in implementing the scheme.  The government's evidence showed that from his office in the Western District of North Carolina, Simmons actively assisted in procuring and transmitting information from the clients and obtaining insurance policies that were a necessary part of the GEP.  And while Kohn and Chollet prepared the tax returns in Missouri and filed them from there, they procured information from their clients directly or through Simmons in North Carolina and advised their clients in North Carolina about their returns.  The record contains numerous emails showing the exchanges of information, and Kohn and Chollet sent their clients in North Carolina signature forms for them to sign in creating limited partnerships and bank accounts that were part of the scheme.  They even registered some of the limited partnerships in North Carolina.  Moreover, Kohn and Chollet sent their clients in North Carolina drafts of the tax returns to receive their approval before filing them.  The one client who did not live in North Carolina testified that he dealt with Kohn through Simmons in North Carolina because Kohn was hard to reach, providing information to Simmons for transmission to Kohn and Chollet.

The conduct elements of § 7206(2) include "aid[ing]," "assist[ing]," "procur[ing]," "counsel[ing]," and "advis[ing]" the preparation of false tax returns, and we conclude that the evidence in the record amply supports a finding that some conduct elements of Kohn

14

and Chollet's crimes took place in North Carolina. Because some conduct elements of § 7206(2) took place in the Western District of North Carolina, venue for the prosecution of those crimes properly lay there. *See* 18 U.S.C. § 3237(a).

IV

The defendants also contend that the "total income" lines on their clients' tax returns were "literally truthful" and that therefore they could not have been convicted of aiding in the filing of *false* tax returns. *See Bronston v. United States*, 409 U.S. 352, 359–62 (1973); *United States v. Good*, 326 F.3d 589, 590 (4th Cir. 2003). They point out that the indictment charged them with willfully aiding and assisting in the preparation of tax returns "which were false and fraudulent" by reporting "false items" on the "total income" lines, knowing that "the amounts on [those] lines . . . were substantially understated." Yet, the defendants argue, the "total income" lines on the tax returns were literally truthful as they accurately followed the tax form's instruction to include there a calculation of the amounts listed on preceding lines. One type of 1040 form, for example, stated on line 22, "Combine the amounts . . . for lines 7 through 21" and advised, "This is your total income." They argue that, because the "total income" lines on the various forms represented an *accurate* calculation of the referenced antecedent lines, the "total income" line was literally true and therefore could not support a charge of advising the preparation of a *false* income tax return. *See United States v. Reynolds*, 919 F.2d 435, 437 (7th Cir. 1990) (recognizing and applying the literal truth defense). Therefore, they argue, the district court erred in refusing to grant their motions for judgments of acquittal on the § 7206(2) counts.

15

The district court rejected the defendants' argument, reasoning that "their assertion that 1+2=3 is 'literally true' holds no water when the evidence was sufficient to prove beyond a reasonable doubt that '1' and '2' were the result of fabricated deductions and fees."

We agree with the district court and find that the defendants' argument is too clever by half. While the defendants followed the forms' instructions and accurately calculated the "total income" based on the amounts they had entered on other lines, that accurate calculation did not make the entry in the "total income" line true — it was an accurate arithmetical calculation, deducting the listed business expenses from income to arrive at "total income," but the deductions were fabricated and therefore false, making the "total income" line also false. In short, an accurate *calculation* does not render the total true when the components themselves are false. *See United States v. Crockett*, 435 F.3d 1305, 1315 (10th Cir. 2006) (recognizing that because the total income line, alleged as false in the indictment, was "derived arithmetically from the other lines, the understatement of . . . wage and salary income automatically caused . . . [the] total income [line] to be understated").

The defendants' reliance on *Reynolds* does not help them. In *Reynolds*, the defendant was charged with providing a false return because line 7 on his return was false. The defendant pointed out, however, that the veracity of line 7 depended directly on "the accuracy of his entry on line 1," and line 1 instructed him to include all "'wages, salaries, and tips,'" which he had listed "exactly as it appeared on the forms W-2," despite the fact that he also had non-W-2 income. 919 F.2d at 437. The *Reynolds* court applied the "literal

truth" defense because line 7 depended on line 1, and the amount entered on line 1 was literally true. But contrary to the defendants' argument here, the *Reynolds* court did not indicate that as long as the sums were correctly *computed*, then line 7 was "literally true," providing a defense to a § 7206 charge. Rather, the court reasoned that line 7 was true because it "depend[ed] on the accuracy of [the] entry on line 1," and line 1 was indeed "literally correct," as it included all W-2 income, as instructed. *Id.*

Here, the "total income" line was not true because it depended on lines that included deductions for business expenses that were fabricated. The circumstances here are fundamentally different from those presented in *Reynolds*.

At bottom, we conclude that the district court did not err in denying the defendants' motions for judgments of acquittal based on the literal truth defense.

V

As to the defendants' remaining arguments, we conclude that they are not persuasive and do not merit extensive discussion.

A

First, the defendants contend that the district court impermissibly allowed the government to amend the indictment by redacting parentheticals identifying — incorrectly, in a few instances — the line numbers on the tax returns where the "total income" amounts were reported. The defendants argue that this was a constructive amendment that impermissibly broadened the basis for conviction and that "the error [was] fatal and reversible *per se*." (Citing *United States v. Whitfield*, 695 F.3d 288, 307 (4th Cir. 2012)).

17

We disagree. The redactions of the line-number references did not broaden the possible bases for conviction so as to amount to an impermissible amendment. *See United States v. Burfoot*, 899 F.3d 326, 338 (4th Cir. 2018) (explaining that a defendant's Fifth Amendment right to a grand jury is violated "when the indictment is effectively altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment" (cleaned up)). Here, both before and after the redactions, the indictment alleged that the "total income" items on the relevant tax returns were false, and all that was removed from the indictment was the line number where the "total income" was entered. That in no way broadened the potential basis for conviction.

B

Second, the defendants argue that the district court abused its discretion in admitting expert testimony through a lay witness. IRS Special Agent Robert Elias testified as a lay witness about his undercover engagement with the defendants during the government's investigation. The defendants maintain that although Special Agent Elias was never qualified as an expert under Federal Rule of Evidence 702, he "repeatedly offered opinions rooted in accounting, tax law, and forensic analysis." The defendants, however, only raised this objection once when Elias was asked, "[a]s a CPA," whether it was his "understanding that insurance premiums normally are not deductible," and he was allowed to respond, "Yes. As a CPA, certified public accountant, that would be my understanding, that they are not deductible normally." On appeal, however, the defendants raise several other

18

instances that they claim were improper opinions, including (1) Elias's testimony explaining that "a P & L is . . . a profit and loss statement," which shows "how much you make" and "[w]hat your expenses are"; (2) his testimony that Kohn's statement to him that "he [Kohn] could amend the 1120-S [corporate return] without input from the other partner" struck him "as very odd" because, for a partnership, "both partners have to agree to the return and what's going to go on it"; and (3) Elias's statement explaining to the jury the difference between a Form 1120-S corporate return and a partnership return.

Federal Rule of Evidence 701 permits a lay witness to give opinion testimony in certain circumstances. Specifically, it provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; *see also United States v. Johnson*, 617 F.3d 286, 292–93 (4th Cir. 2010).

In this case, while we recognize that perhaps a few statements may have crossed slightly into the territory of expert testimony, any such testimony was clearly harmless. *First*, the defendants have not attempted to satisfy the plain-error standard applicable to those portions of Elias's testimony to which they did not make an objection below. *Second*, the potentially problematic statements were extremely limited and perhaps even justified under Rule 701. *Third*, it seems clear that Special Agent Elias — an IRS agent for more than 20 years who had previously earned a CPA license and was currently pursuing a doctorate degree in accounting — could have been qualified as an accounting expert under

19

Rule 702. *See United States v. Smith*, 640 F.3d 358, 366 (D.C. Cir. 2011) (concluding that error was harmless in part because the witness "would have qualified as an expert and testified about the slang conversations under Rule 702"); *United States v. DeLoach*, No. 99-4441, 2000 WL 274972, at *3 (4th Cir. Mar. 14, 2000) (per curiam) ("[W]e find that even if the court erred by admitting it as lay testimony, the error was harmless because [the witness] could have been certified as an expert under Rule 702"). And *fourth* and finally, an IRS agent who was duly qualified as an expert witness at trial under Rule 702 did indeed make many of the same points that Special Agent Elias made, rendering the arguably impermissible testimony cumulative.

C

Third, Kohn argues that the district court abused its discretion in admitting at trial evidence of Kohn's previous guilty plea of endeavoring to obstruct the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a).

One of the allegations in the indictment was that in promoting the GEP to clients, Kohn not only misrepresented his educational background, but also told clients false and incomplete information about his previous guilty plea, bragging that it showed that he would go to great lengths in representing and protecting his clients. Prior to trial, Kohn filed a motion in limine to exclude any evidence of the conviction, but the district court denied the motion, ruling that the government "may ask . . . witnesses whether they were comforted or lulled into working with the Defendants" by misrepresentations about Kohn's prior conviction.

20

In light of the court's ruling on the motion in limine, Kohn's counsel told the jury during his opening statement that "[y]ou may learn over the course of this trial that 22 years ago. Mr. Kohn made the biggest mistake of his life, and he accepted responsibility for it. He pled guilty to impeding or obstructing the IRS for conduct that occurred 26 to 30 years ago . . . ." Kohn and the government subsequently agreed to a stipulation for describing that conviction, and the court specifically advised the jury of its limited use, emphasizing that it was "very important[]" that the jury "not conclude from this evidence that Mr. Kohn has bad character in general or that because . . . he did commit similar acts, that he is more likely to have committed this crime with which he is currently charged." Thereafter, three former clients and the undercover IRS special agent provided testimony about Kohn's statements regarding his prior conviction, and the government also introduced a letter from Kohn to a client about the conviction.

Kohn now contends that the district court abused its discretion in admitting the stipulation, arguing that it was inadmissible under Federal Rule of Evidence 404(b), and that, in any event, it was unduly prejudicial under Rule 403.

We conclude that the district court did not abuse its discretion. First, it would appear that Kohn waived this issue by raising the fact of his conviction preemptively in his opening statement to the jury and in entering into a stipulation with the government as to how to describe it for the jury. *Cf. Ohler v. United States*, 529 U.S. 753, 760 (2000) (holding "that a defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the admission of such evidence was error").

21

But even if it were not waived, Kohn's challenge lacks merit. The evidence of his prior conviction was not freestanding but directly tied to the representations he made about that conviction to clients when marketing the GEP at issue in the current case. This made the prior conviction relevant, intrinsic evidence. Similarly, the district court did not abuse its discretion in concluding that the evidence was not unfairly prejudicial under Rule 403. Indeed, Kohn's counsel noted below that the whole point of the stipulation was to "reduce the danger of prejudice on the balance," and the stipulation was followed by a strongly worded cautionary instruction given by the court.

D

Fourth, Simmons argues that the district court abused its discretion in failing to give a reliance-on-counsel instruction, as he had requested. In rejecting Simmons's request, the court explained that "there was virtually no evidence of Mr. Simmons's reliance on specific advice based upon what's required, [*i.e.,*] full disclosure of all relevant facts and the specific advice rendered and evidence that that advice was followed." Nonetheless, the court did give the jury a more general good-faith instruction.

In challenging the court's decision, Simmons points to an email from Kohn about the treatment of a single-member LLC on Simmons 2016 tax return, as well as testimony regarding checks that Simmons had sent to Kohn that purported to be for "legal advice that The Kohn Partnership provided for Gain Elimination Plan clients." This evidence, however, falls far short of demonstrating that the district court abused its discretion in finding an inadequate evidentiary basis, given the more extensive requirements for

22

asserting the defense. *See United States v. Butler*, 211 F.3d 826, 833 (4th Cir. 2000). Moreover, a defense of advice of counsel must necessarily fail where counsel acted as an accomplice to the crime. *See United States v. West*, 392 F.3d 450, 456–57 (D.C. Cir. 2004); *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010). Finally, we are satisfied that any error would be harmless in light of the good-faith instruction that the court did provide. *See United States v. Mallory*, 988 F.3d 730, 739 (4th Cir. 2021).

E

Fifth and finally, the defendants argue that the evidence was insufficient to support a conviction for conspiracy to defraud the government. They argue that "the Government charged that the defendants attempted to defraud the IRS by use of the GEP" but then failed to prove that the GEP was illegal. Principally, they point to the testimony of the government's expert witness, who acknowledged that such plans "can be completely legal." And if it was legal, they contend, the government failed to show that they conspired to commit an illegal act.

It appears that although the defendants raised other grounds in support of their motions for a judgment of acquittal, they failed to make this argument before the district court, at least explicitly, thereby waiving it. *See United States v. Chong Lam*, 677 F.3d 190, 200 (4th Cir. 2012). But even if they had somehow preserved it with their more general Rule 29 motions, the argument lacks merit.

The defendants emphasize repeatedly that the government's expert witness testified that a GEP "can be completely legal." But this argument fails to recognize that the expert

23

witness's full answer was that GEP plans "can be completely legal . . . *if they have economic substance*." She testified further that the plans implemented by the defendants in this case *lacked economic substance*. In short, the government never argued nor attempted to prove that the GEP, as a concept, was illegal. Rather, it argued and proved that the plan, as implemented, involved the fabrication of business expenses to lower clients' taxable income and that therefore, lacking any real economic substance, it was fraudulent.

Additionally, Chollet argues that there was no testimony to establish that she joined the alleged conspiracy. But, as the district court concluded, there was evidence that Chollet prepared a number of the returns at issue and reviewed others. The testimony showed that Kohn and Chollet worked as a team. Chollet also used the GEP to shelter her own income. And she was recorded telling the undercover IRS agent that he could have confidence in plan because "the IRS never really comes in and has a global look at what you're doing. . . . They're never going to see the moving pieces of the plan as a whole between different taxpayers."

We thus reject the defendants' arguments of insufficient evidence.

\*     \*     \*

For the reasons given, we affirm the judgments of the district court.

AFFIRMED

24